# Exhibit A

IN THE SUPERIOR COURT OF INDIANA
IN AND FOR MARION COUNTY

GEORGE STRAKIS,

                              Plaintiff,

          v.

BRS FIELD OPS LLC d/b/a BLUE RAVEN
SOLAR, BLUE RAVEN SOLAR LLC,

                              Defendants.

Case No. 49D05-2512-PL-056607

**Clerk's Action Required**

## <u>NOTICE OF REMOVAL BY DEFENDANTS</u>

On January 16, 2026, Defendants BRS Field Ops, LLC and Blue Raven Solar, LLC filed

with the United States District Court for the Southern District of Indiana, Case No. 1:26-cv-00092-

JPH-MJD, a Notice of Removal to said District Court of this action brought in the Superior Court

of Indiana for Marion County. A true copy of the Notice of Removal is attached as **Exhibit A**.

Dated: January 16, 2026.

                         */s/ Kimberli A. Diggs*
                         Kimberli A. Diggs, ISBA # 32802-45
                         K&L Gates LLP
                         1 Park Plaza, Floor 12
                         Irvine, CA  92614
                         Phone: (949) 623-3541
                         Email: Kimberli.Diggs@klgates.com

                         *Counsel for Defendants BRS Field Ops, LLC and
                         Blue Raven Solar, LLC*

## CERTIFICATE OF SERVICE

I certify that on January 16, 2026, I arranged for electronic filing of the foregoing document with the Clerk of the Court, which will provide electronic copies of the foregoing to the following parties:

> Grover B. Davis
> Scott S. Mandarich
> McClure McClure & Davis
> 6602 East 75th Street, Suite 112
> Indianapolis, IN 46250
> Telephone: (317) 221-0800
> Email: gbdavis@gbd.law
> Email: smandarich@gbd.law
>
> *Counsel for Plaintiff George Strakis*

Dated: January 16, 2026, at Irvine, California.

*/s/ Kimberli A. Diggs*
Kimberli A. Diggs

1605427821.2

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GEORGE STRAKIS,

Plaintiff,

v.

BRS FIELD OPS, LLC d/b/a BLUE RAVEN
SOLAR, BLUE RAVEN SOLAR LLC,

Defendants.

Case No.

## NOTICE OF REMOVAL

Defendants BRS Field Ops, LLC ("BRS Field Ops") and Blue Raven Solar, LLC ("BRS")

hereby give notice of the removal of Case No. 49D05-2512-PL-056607, commenced in the

Superior Court of the State of Indiana for Marion County ("State Court"), to the United States

District Court for the Southern District of Indiana (Indianapolis Division), pursuant to 28 U.S.C.

§§ 1331, 1332, 1441, and 1446. In support of this removal, Defendants state as follows:

1.      On or about December 1, 2025, Plaintiff George Strakis filed a complaint against

Defendants captioned *Strakis v. BRS Field Ops, LLC et al*. (the "State Court Case"). The

Summons and Complaint invoke the jurisdiction of the State Court. A true copy of the operative

Complaint is attached as **Exhibit A** ("Complaint").

2.      BRS Field Ops has not been properly served with a copy of the Summons and

Complaint filed in the State Court Case, and Plaintiff has not filed a Return on Service of

Summons with the State Court purporting to have accomplished service on BRS Field Ops.

3.      Plaintiff filed a Return on Service of Summons in the State Court Case stating that on December 17, 2025, Plaintiff served a copy of the Summons and Complaint filed in the State Court Case on BRS's agent for service of process.

4.      BRS Field Ops and BRS were both debtors in Chapter 11 Bankruptcy. *In re BRS Field Ops, LLC*, No. 24-11661-CTG (Bank. D. Del. Aug. 5, 2024); *In re Blue Raven Solar, LLC*, No. 24-11659-CTG (Bankr. D. Del. Aug. 5, 2024). Both bankruptcies were jointly administered with the bankruptcies of other related debtors in *In re Sunpower Corporation et al.*, No. 24-11649-CTG (Bankr. D. Del. Aug 5, 2024) ("SunPower Bankruptcy"). On September 23, 2024, the United States Bankruptcy Court for the District of Delaware entered an order approving the sale of certain assets of the debtors, including certain assets of BRS Field Ops and BRS, to Complete Solaria, Inc. ("Complete Solaria"). *See* Order, Dkt 605, SunPower Bankruptcy. Complete Solaria closed on the purchase of those assets on September 30, 2024. Complete Solaria was renamed SunPower effective October 17, 2025. The undersigned counsel appeared on behalf of BRS Field Ops and BRS to the extent that such appearance is necessary to assert and protect the rights acquired by SunPower in certain assets of BRS Field Ops and BRS.

5.      This Notice of Removal is timely under 28 U.S.C. § 1446(b), as it is filed and served within thirty (30) days of BRS's receipt of the Summons and Complaint filed in the State Court Case.

## JURISDICTION

6.      28 U.S.C. § 1441(a) provides that any civil action brought in a state court of which the district courts of the United States have original jurisdiction, may be removed by the defendant to the district court of the United States for the district and division embracing the place where such action is pending.

7.     This case is properly removed to this Court under 28 U.S.C. § 1441(a) because this Court has original jurisdiction pursuant to 28 U.S.C. § 1332 in that Plaintiff's action meets all requirements for diversity jurisdiction. This Court has jurisdiction under 28 U.S.C. § 1332 because this case is between parties with complete diversity and the amount in controversy exceeds $75,000.

8.     <u>Citizenship of Plaintiff</u>. An individual is a citizen of the State in which they are domiciled. *Altom Transp., Inc. v. Westchester Fire Ins. Co.*, 823 F.3d 416, 420 (7th Cir. 2016). Plaintiff is domiciled in the State of Indiana because they are both a resident of and own a home in the state. Compl. ¶ 2. *See Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996) (holding that domicile is established by "physical presence in a state, with intent to remain there").

9.     <u>Citizenship of Defendants</u>. A limited liability company is a citizen of every state of which its owners and members are citizens. *Qin v. Deslongchamps*, 31 F.4th 576, 579 (7th Cir. 2022). BRS Field Ops and BRS are manager-managed limited liability companies and Blue Raven Solar Holdings, LLC holds 100% of their equity interests. Voluntary Petition for Non-Individual Filing for Bankruptcy, Dkt 1 at 6, 17, *In re BRS Field Ops, LLC*, No. 24-11661-CTG (Bank. D. Del. Aug. 5, 2024); Voluntary Petition for Non-Individual Filing for Bankruptcy, Dkt 1 at 6, 17, *In re Blue Raven Solar, LLC*, No. 24-11659-CTG (Bankr. D. Del. Aug. 5, 2024). Therefore, Blue Raven Solar Holdings, LLC is the sole owner and member of Defendants. Blue Raven Solar Holdings, LLC is a member-managed limited liability company and Falcon Acquisition HoldCo, Inc. holds 100% of its equity interests. Voluntary Petition for Non-Individual Filing for Bankruptcy, Dkt 1 at 6, 17, *In re Blue Raven Solar Holdings, LLC*, Case 24-11660-CTG (Bankr. D. Del. Aug. 5, 2024). Therefore, Falcon Acquisition HoldCo, Inc. is the sole owner and member of Blue Raven Solar Holdings, LLC. Falcon Acquisition HoldCo, Inc. is a Delaware corporation

with its principal place of business in California. Therefore, Defendants are citizens of Delaware and California.

10.     Because Plaintiff is a citizen of Indiana and Defendants are citizens of Delaware and California, complete diversity exists between Plaintiff and Defendants.

11.     <u>Amount in Controversy</u>. Plaintiff seeks actual damages of no less than $76,062.98 in addition to treble damages and other monetary relief. Compl. ¶¶ 25-27, 30, 59. Because Plaintiff seeks an amount in excess of $75,000, exclusive of interest and costs, the amount in controversy is satisfied.

**PROCEDURAL COMPLIANCE**

12.     Pursuant to 28 U.S.C. § 1441 *et seq.*, the right exists to remove this case from the State Court to the United States District Court for the Southern District of Indiana, which embraces the place where the action is pending.

13.     The United States District Court for the Southern District of Indiana embraces the county in which the state court action is now pending and thus, this Court is a proper venue for this action pursuant to 28 U.S.C. § 94(b)(1). Because the State Court from which this case is being removed is the Superior Court of the State of Indiana for Marion County, this case is assigned to the Indianapolis Division.

14.     No previous application has been made for the relief requested herein.

15.     All Defendants consent to removing this case to the United States District Court for the Southern District of Indiana.

16.     Written notice of the filing of this Notice of Removal will be served upon Plaintiff as required by law.

17.     A true copy of this Notice of Removal will be filed with the clerk of the State Court,

as required by law, and served upon Plaintiff.

18.    Pursuant to S.D. Ind. L.R. 81-2(a), a true copy of the State Court Record is attached as **Exhibit B**, which the undersigned counsel verifies is complete as of the date of removal.

19.    Pursuant to S.D. Ind. L.R. 81-2(d), a true copy of the operative Complaint is attached as **Exhibit A**.

20.    Because no motions are currently pending in the State Court Case, Defendants are not required to file a notice pursuant to S.D. Ind. L.R. 81-2(e).

## RESERVATION OF RIGHTS

21.    Nothing in this Notice of Removal is intended to waive any defense, nor does it waive any defense, including but not limited to defenses stated in Federal Rule of Civil Procedure 12(b), defenses on the merits, and defenses to claims for potential damages by Plaintiff or any other individual. Defendants expressly preserve all objections under Federal Rule of Civil Procedure Rule 12(b). *See* Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1395 (3d ed. 2002) ("When a defendant removes an action from a state court in which he has been sued, he consents to nothing and 'waives' nothing; he is exercising a privilege unconditionally conferred by statute, and, since the district court to which he must remove it is fixed by law, he has no choice, without which there can be no 'waiver.'") (quoting *Greenburg v. Gianni*, 140 F.2d 550, 553 (2d Cir. 1944)).

WHEREFORE, Defendants respectfully give notice that the above-entitled action is removed from the Superior Court of the State of Indiana for Marion County to the United States District Court for the Southern District of Indiana, Indianapolis Division.

Dated: January 16, 2026.

/s/ Kimberli A. Diggs
Kimberli A. Diggs, ISBA # 32802-45
K&L Gates LLP
1 Park Plaza, Floor 12
Irvine, CA 92614
Phone: (949) 623-3541
Email: Kimberli.Diggs@klgates.com

*Counsel for Defendants BRS Field Ops, LLC and
Blue Raven Solar, LLC*

# CERTIFICATE OF SERVICE

I certify that on January 16, 2026, I provided electronic copies of the foregoing to the following parties by email and U.S. mail.

> Grover B. Davis
> Scott S. Mandarich
> McClure McClure & Davis
> 6602 East 75th Street, Suite 112
> Indianapolis, IN 46250
> Telephone: (317) 221-0800
> Email: gbdavis@gbd.law
> Email: smandarich@gbd.law
>
> *Counsel for Plaintiff George Strakis*

Dated: January 16, 2026, at Irvine, California.

>                     */s/ Kimberli A. Diggs*
>                     Kimberli A. Diggs

JS 44 (Rev. 10/20) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) **PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| George Strakis | BRS Field Ops, LLC and Blue Raven Solar, LLC |

**(b)** County of Residence of First Listed Plaintiff   Marion County, IN
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Grover B. Davis and Scott S. Mandarich, McClure
McClure & Davis, 6602 East 75th Street, Suite 112,
Indianapolis, IN 46250, (317) 221-0800

Attorneys *(If Known)*
Kimberli A. Diggs, K&L Gates LLP, 1 Park Plaza, Floor 12,
Irvine, CA 92614, (949) 623-3541

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government
Plaintiff
- ☐ 2   U.S. Government
Defendant
- ☐ 3   Federal Question
*(U.S. Government Not a Party)*
- ☒ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☐ 1   Original Proceeding
- ☒ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC Section 1332 (diversity)
Brief description of cause:
Alleged violation of state law in connection with solar energy contract

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

**VIII. RELATED CASE(S) IF ANY**   *(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
Jan 16, 2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Kimberli A. Diggs

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.(a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II. **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

V. **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# Exhibit A
# (Operative Complaint)

STATE OF INDIANA    )    IN THE MARION SUPERIOR/CIRCUIT COURT
              ) SS:
COUNTY OF MARION    )    CAUSE NO.:

GEORGE STRAKIS                )
                            )
        Plaintiff,           )
                            )
    v.                       )
                            )
BRS FIELD OPS, LLC, d/b/a    )
BLUE RAVEN SOLAR, and      )
BLUE RAVEN SOLAR, LLC      )
                            )
        Defendants.        )

## COMPLAINT

Plaintiff, George Strakis ("Plaintiff"), by counsel, for his Complaint against Defendants BRS FIELD OPS, LLC d/b/a Blue Raven Solar and Blue Raven Solar, LLC (collectively "Defendants") states:

## PARTIES

1.    George Strakis is a resident of Indianapolis, Marion County, Indiana, and is the owner of the residential real estate located at 1027 E. Brunswick Avenue, Indianapolis, IN 46227 (the "Property") that is subject to this action.

2.    Blue Raven Solar, LLC ("Blue Raven") is a foreign limited liability company authorized to do business in Indiana, with a principal business address located at 1403 N. Research Way, Orem, UT. Blue Raven markets, sells, and coordinates the installation of residential solar systems throughout Indiana.

3.     BRS Field Ops, LLC ("BRS Field Ops") is a foreign limited liability company formerly authorized to do business in Indiana, with a principal business address located at the same Utah address used by Blue Raven. BRS Field Ops served as the contracting and installation affiliate for Blue Raven in Indiana and executed customer contracts on behalf of or for the benefit of Blue Raven.

4.     At all relevant times, Blue Raven and BRS Field Ops operated as a unified business enterprise, shared common management, listed the same Utah business address, and held themselves out to Indiana consumers as a single integrated provider of residential solar services.

5.     At all relevant times, Blue Raven and BRS Field Ops jointly participated in, controlled, or benefitted from the representations, contracting activities, installation services, and customer interactions giving rise to this action.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the parties because Defendants regularly conduct business within Indiana, have transacted business in Indiana by marketing, contracting for, and installing residential solar systems, and committed the acts and omissions giving rise to this action within Indiana.

7.     Venue is proper in Marion County, Indiana under Indiana Trial Rule 75 because the real estate that is the subject of this action is located in Marion County, the installation and misrepresentations occurred there, and Plaintiff resides in the same county.

## FACTUAL ALLEGATIONS

8.      On or around March 13, 2024, Plaintiff contracted with BRS FIELD OPS, doing business as Blue Raven Solar, for the installation of a residential solar panel system on the roof of the Property. A true and accurate copy of the contract ("Contract") between Plaintiff and BRS FIELD OPS is attached to this Complaint as Exhibit A.

9.      The Contract required Blue Raven to conduct a Site Survey of the property for the purpose of determining whether the roof was structurally suitable for solar installation.

10.     The Contract further provided that, in addition to the statutory three-day right to cancel, Plaintiff had ten (10) days after delivery of the initial Final Design following the Site Survey to cancel the Agreement without penalty or obligation.

11.     Pursuant to the Contract, Blue Raven conducted the Site Survey and pre-installation inspection of the Property for the purpose of determining whether the roof was structurally sound and suitable to support the installation of the solar system.

12.     Following the Site Survey, Blue Raven delivered the Final Design to Plaintiff. Neither the Site Survey nor the Final Design disclosed any structural deficiencies, damaged decking, compromised rafters, or other conditions that would render the roof unsuitable for installation. As a result of Blue Raven's representations that the roof was structurally sound enough to support the solar

panels, Plaintiff did not exercise his contractual ten-day right to cancel the Agreement after receiving the Final Design.

13.    On April 26, 2024, Blue Raven installed the solar panel system on Plaintiff's roof. Plaintiff did not receive any report or communication from Blue Raven indicating that installers observed damaged decking, stepped through roof boards, or encountered any conditions requiring repair before installation.

14.    In March 2025, Plaintiff's son returned to the Property and observed significant interior water damage in the bedroom and closet directly below the area where the solar panels were installed. The damage included ceiling staining, moisture accumulation, drywall deterioration, and mold growth.

15.    Plaintiff contacted Blue Raven to report the issue. Blue Raven assigned a work-order specialist and scheduled an inspection, which occurred on or about March 26, 2025. During that visit, Blue Raven's technician acknowledged moisture in the attic and attributed the issue to leaking roofing nails. The technician stated that a roofing specialist would be scheduled for a further assessment.

16.    Plaintiff was informed that a roofing specialist visit was scheduled for April 11, 2025. No representative appeared for that appointment. When Plaintiff contacted Blue Raven's main office, Plaintiff was informed for the first time that Blue Raven was declining responsibility for the condition of the roof and asserting that the structural and moisture-related issues were "pre-existing."

17.    Following this communication, Plaintiff contacted his homeowner's insurance carrier to conduct an independent inspection. The insurance inspector identified broken roof decking directly beneath the solar panel installation area, as well as additional roof-related deterioration and moisture intrusion.

18.    On April 24, 2025, Priority Home Solutions performed a comprehensive roofing assessment. Based on its inspection, Priority Home Solutions concluded, among other things, that:

    a. The roofing system exhibited compromised shingles, deteriorated components, and structural damage beneath the solar panel installation area;

    b. A section of roof decking directly under the solar panels was broken in a manner consistent with someone stepping through the decking during installation;

    c. The extent of roof deterioration required a full roof replacement; and

    d. No severe weather events had occurred between the installation date and the discovery of damage.

19.    Priority Home Solutions further documented that the existing roofing system consisted of a 30-year dimensional shingle that was nearing or had surpassed its expected life span. The inspection further noted age-related deterioration, including non-sealed shingle tabs, fiber exposure, thermal cracking, and other characteristics consistent with an aged or failed roofing

system. A roof in such condition generally requires repair or replacement prior to the installation of a solar panel system, and such conditions should have been observed and disclosed during Blue Raven's Site Survey.

20.    Further, it was determined that the preexisting roof consisted of spaced decking and shingles without any solid decking, which was consistent with older construction standards and building codes. These older construction standards, lacking proper roof decking and reinforcement, were not designed to support the weight or mounting requirements of modern solar panel systems, a fact that was or should have been known to Blue Raven prior to its installation of the solar panel system.

21.    Priority Home Solutions also determined that moisture intrusion affected the attic insulation, drywall, and interior finishes, necessitating insulation removal, mold-related remediation, and drywall repair.

22.    At no time prior to installation did Blue Raven disclose any concerns regarding the structural integrity of the roof or its suitability for installing the solar system. At no time during installation did Blue Raven notify Plaintiff of any damaged decking, compromised structure, or condition requiring remediation.

23.    Plaintiff reasonably relied upon Blue Raven to identify and disclose any structural concerns during the Site Survey and to design the system only if the roof was suitable for installation. Plaintiff further relied upon Blue Raven's silence and failure to report any roof-integrity issues, and accordingly did not exercise his contractual right to cancel the Agreement following delivery of the Final Design.

24.     Following the discovery of the water intrusion, structural deterioration, and roof damage described above, Plaintiff contracted with Priority Home Solutions to perform the necessary roof replacement and associated remedial work, including removal of damaged materials, installation of new roofing, and remediation of attic mold and interior ceiling damage.

25.     Priority Home Solutions immediately installed an emergency tarp covering at a cost of approximately $1,200.00. This mitigation was necessary to prevent additional damage while Plaintiff sought total repair estimates.

26.     In addition to the emergency tarp costs, the total cost of the roof replacement and associated remedial work was $61,662.98, which Plaintiff paid in order to restore the property to a safe and habitable condition.

27.     In order for the roof replacement to be completed, the existing solar panels had to be removed and later reinstalled. Blue Raven ultimately agreed to remove and reinstall the solar panels to permit roofing work, but nevertheless charged Plaintiff $5,000.00 for the removal and reinstallation. This charge was incurred even though the need to remove the panels resulted directly from the roof damage caused by Blue Raven's installation.

28.     After Priority Home Solutions completed the roof replacement, Blue Raven returned to the property to reinstall the solar panel system. During the course of the reinstallation process, new damage occurred to portions of the newly installed roofing, including torn or displaced shingles and other conditions requiring additional repair.

29.    Plaintiff notified Blue Raven of the new damage observed during or following the reinstallation process. Despite this notification, Blue Raven declined to accept responsibility for the additional damage to the newly installed roof.  Blue Raven's formal denial of responsibility only came after repeated delays and promises that they would evaluate the damage, which they never did.

30.    Plaintiff has not yet proceeded with repairs to the newly discovered damages because doing so would again require removal of the solar panels—an additional $5,000.00 expense to Blue Raven—and then completion of the roofing work estimated at $3,200.00 by Priority Home Solutions. Plaintiff further understands that the newly affected portions of the roof may no longer qualify for the full 50-year warranty coverage previously provided due to the new damage and the panel reinstallation.

31.    In addition to the new repairs, since the reinstallation of the solar panels, the solar panels are now longer functioning correctly and are consistency returning less solar energy than they were prior to the reinstallation. As a result, Plaintiff is no longer getting the energy savings which should come with solar panel use, thus negating the purpose of the panels entirely.

## COUNT I
## FRAUD IN THE INDUCEMENT

32.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

33.     The Contract required Blue Raven to conduct a Site Survey to determine whether the property's roof was structurally suitable for installation of a residential solar system

34.     The Contract provided Plaintiff with ten (10) days after delivery of the Final Design, following the Site Survey, to cancel the Agreement without penalty.

35.     Blue Raven failed to disclose material facts regarding the suitability and condition of the roof, including that the roofing system was nearing or had surpassed its expected life span, that the roof was not structurally capable of handling the solar panels, or that the roof exhibited deterioration affecting its ability to support the installation.

36.     The condition and suitability of the roof constituted material facts affecting the consumer transaction.

37.     Blue Raven knew or reasonably should have known that the roof conditions made installation unsafe or inappropriate and that nondisclosure of these facts would mislead Plaintiff.

38.     Blue Raven's omission of material information prevented Plaintiff from exercising his contractual right to cancel the Agreement after receipt of the Final Design.

39.     Plaintiff reasonably relied on Blue Raven's nondisclosure and proceeded with the installation believing the roof was suitable.

40.    As a direct and proximate result, Plaintiff sustained damages including the cost of roof replacement, interior repairs, mold remediation, and related losses.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count I, award all damages proximately caused by Defendants' fraudulent inducement, including compensatory damages, pre- and post-judgment interest, attorney's fees and costs as permitted by law, and all other just and proper relief.

## COUNT II
## FRAUD

41.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

42.    During installation on April 26, 2024, a section of roof decking directly beneath the solar array was broken in a manner consistent with someone stepping through the decking.

43.    Blue Raven knew or reasonably should have known of this damage during installation, as such damage would have been visible and apparent to installers performing if not caused by the installers themselves.

44.    Blue Raven failed to disclose this damage to Plaintiff and instead continued with installation.

45.    Blue Raven possessed superior knowledge of the conditions discovered or created during installation and had a duty to disclose such material facts.

46.     Blue Raven's failure to disclose constituted actual fraud or, in the alternative, constructive fraud based on its superior knowledge and the trust Plaintiff placed in its professional expertise.

47.     Plaintiff relied on Blue Raven's representations and/or omissions suggesting that the installation was successful and without issue.

48.     As a direct and proximate result, Plaintiff suffered structural damage, water intrusion, interior deterioration, mold growth, and significant remediation costs.

WHEREFORE Plaintiff respectfully requests that the Court enter judgment in his favor on Count II, award all damages resulting from Defendants' failure to disclose installation-related damage, including compensatory damages, consequential losses, interest, costs, attorney's fees as allowed by law, and all other just and proper relief.

## COUNT III
## BREACH OF CONTRACT

49.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

50.     Plaintiff entered into a valid and enforceable Home Improvement Contract with BRS Field Ops, LLC d/b/a Blue Raven Solar.

51.     Blue Raven breached the Agreement by:

    a. Failing to identify and disclose roof conditions affecting suitability;

    b. Installing the system on a deteriorated or structurally unsound roof;

    c. Causing damage to the roof decking and shingles during installation and reinstallation;

    d. Failing to reinstall the system without causing further damage after roof replacement; and

    e. Failing to honor its warranty obligations concerning roof penetrations and installation work.

52. Plaintiff fully performed his obligations under the Contract.

53. As a direct and proximate result of Blue Raven's breaches, Plaintiff incurred substantial damages, including the cost of roof replacement, interior repairs, mold remediation, additional roof repairs after reinstallation, and diminished performance of the solar system.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count III, award compensatory damages for Defendants' breach of the Agreement, including the full cost of repairs and related consequential damages, together with pre- and post-judgment interest, costs of this action, and all other just and proper relief.

## COUNT IV
## NEGLIGENCE

54. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

55.    Blue Raven owed Plaintiff a duty to exercise reasonable care in evaluating roof suitability, performing the Site Survey, installing the solar system, and reinstalling the system after roof replacement.

56.    Blue Raven breached its duty of care by:

a.    Failing to conduct a reasonable and competent Site Survey;

b.    Failing to identify or disclose obvious roof deterioration or structural concerns;

c.    Installing the system on a roof that was at or beyond its expected lifespan;

d.    Creating or failing to disclose damage to the roof decking during installation;

e.    Causing new damage to the roof during reinstallation; and

f.    Failing to remedy or properly report issues known or reasonably discoverable

57.    As a direct and proximate result, Plaintiff suffered damages including roof failure, water intrusion, interior damage, mold growth, and related expenses

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count IV, award compensatory damages for all losses proximately caused by Defendants' negligence, including property damage, remedial costs, and loss of use, together with interest, costs, and all other just and proper relief.

## COUNT V
## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT

58.　　Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

59.　　Blue Raven is a "supplier" engaged in a "consumer transaction" as defined by Ind. Code § 24-5-0.5-2.

60.　　Under Ind. Code § 24-5-0.5-3, a supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.

61.　　Blue Raven committed one or more "deceptive acts" in violation of Ind. Code § 24-5-0.5-3, including:

  a.　Misrepresenting or implying that the roof was suitable for installation;

  b.　Failing to disclose material facts necessary to prevent its representations from being misleading, including roof age, deterioration, and structural concerns;

  c.　Failing to disclose installer-caused roof damage during installation;

  d.　Misrepresenting the cause of water intrusion as "roofing nail leaks";

  e.　Promising to provide a roofing specialist inspection, then denying responsibility;

  f.　Refusing to remedy known or reasonably discoverable installation-related damage; and

g.  Misrepresenting the quality, characteristics, or benefits of its

installation services.

57.    Blue Raven's deceptive acts were uncured and incurable as Blue

Raven denied responsibility and refused to correct the underlying conditions.

58.    As a result of these deceptive acts, Plaintiff suffered actual

damages, including roof replacement, interior repairs, mold remediation,

additional repair costs after reinstallation, and loss of use of portions of the

home.

59.    Plaintiff is entitled to the remedies provided under Ind. Code § 24-

5-0.5-4, including treble damages, attorney's fees, costs, and all other

appropriate relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter

judgment in his favor on Count V, award actual damages, treble damages as

authorized by Ind. Code § 24-5-0.5-4, reasonable attorney's fees and costs,

interest, and all other relief the Court deems just and proper.


Respectfully submitted,

*/s/ Scott S. Mandarich*
Grover B. Davis, 4408-49
Scott S. Mandarich, 34444-49
MCCLURE MCCLURE & DAVIS
6602 E. 76th Street, Ste. 112
Indianapolis, Indiana 46250
Telephone:  317-221-0800
gbdavis@gbd.law
smandarich@gbd.law

MCCLURE MCCLURE & DAVIS
6602 E. 75th Street, Suite 112
Indianapolis, Indiana 46250
Telephone:  317-221-0800
gbdavis@gbd.law
smandarich@gbd.law

Filed 06/30/2025 1:16 PM
Clerk
Marion County, Indiana
Superior Court 5





# Homeowner's Insurance Addendum
# Third Party Authorization to Release Information

Homeowner Name  George Strakis

Property Address  1027 East Brunswick Avenue, Indianapolis, Indiana, 46227

Phone  3172017937                    Email  strakisgeorge@me.com

With my signature below, I authorize the following contractor to contact my homeowner's insurance provider and to request and receive a copy of the declarations page of my homeowner's insurance policy and any other relevant information for the purpose of contractor submitting on my behalf for residential solar interconnection through my utility company.

The contractor submitting my interconnection application and performing the installation of my rooftop photovoltaic solar system is:

Contractor Name:  BRS Field Ops, LLC

Address:  1403 N. Research Way
Orem, UT  84097

FEIN:  81-4452370
Phone:  800-377-4480
Fax:  385-265-5041 (Send ATTENTION to "Support")
Email:  support@blueravensolar.com

Homeowner Signature:  *George Strakis*        Date:  03 / 13 / 2024

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|---|---|---|
| **George Strakis**<br>Email: strakisgeorge@me.com | | |
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |

**Recipient Verification:**

✔ Email verified      13 Mar 2024 17:33:42 UTC

IP address: 99.149.26.146
Location: Indianapolis, United States

Document completed by all parties on:

13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.





# Homeowner Permission for Inspection Access

Homeowner Name  George Strakis

Property Address  1027 East Brunswick Avenue, Indianapolis, Indiana, 46227

Phone  3172017937                                Email  strakisgeorge@me.com

With my signature below, I grant the following contractor and any municipal or utility inspecting authority having jurisdiction over my property, and each of its respective employees, agents, independent contractors, and subcontractors, the right to access and be on all of my property as necessary for permit and inspection-related activities concerning the inspection, design and engineering, construction and installation, interconnection, and energization of my photovoltaic solar system at the property address first stated above.

The contractor performing the inspection, design and engineering, construction and installation, interconnection, and energization of my photovoltaic solar system is:

Contractor Name:  BRS Field Ops, LLC

Address:  1403 N. Research Way
Orem, UT  84097

FEIN:  81-4452370
Phone:  800-377-4480
Fax:  385-265-5041 (Send ATTENTION to "Support")
Email:  support@blueravensolar.com

Homeowner Signature:  *George Strakis*          Date:  03 / 13 / 2024

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|--------|-----------|-----------|
| **George Strakis**<br>Email: strakisgeorge@me.com | | |
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |
| **Recipient Verification:** | | IP address: 99.149.26.146 |
| ✔Email verified | 13 Mar 2024 17:33:42 UTC | Location: Indianapolis, United States |

Document completed by all parties on:
13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 50,000+ companies worldwide.





**BRS FIELD OPS, LLC**
1403 N. Research Way
Orem, UT 84097
800-377-4480
support@blueravensolar.com
License # <u>see local municipality</u>

# SOLAR SYSTEM HOME IMPROVEMENT CONTRACT

Customer Name   George Strakis

Address   1027 East Brunswick Avenue, Indianapolis, Indiana, 46227

Phone   3172017937                              Email   strakisgeorge@me.com

      THIS SOLAR SYSTEM HOME IMPROVEMENT CONTRACT (the "Agreement") is entered into by and between **BRS FIELD OPS, LLC** ("Company"), a Utah limited liability company *doing business as* <u>Blue Raven Solar</u>, and the customer(s) identified above ("you" or the "Customer") (collectively, the "Parties") for the purchase and installation of a solar photovoltaic system together with a solar energy storage device, *if any*:

      **NOW THEREFORE**, for and in consideration of the mutual covenants and agreements contained herein and each act done pursuant hereto, the Parties, intending to be legally bound, agree as follows:

1.  **Definitions**. Unless the context otherwise requires, when used herein the following terms shall have the meaning indicated:

    1.1.   <u>Agreement Documents</u> means all documents, exhibits, attachments, and addenda identified herein and those delivered as a part hereof or incident hereto, including but not limited to the Investment Tax Credit Addendum. The Agreement Documents are incorporated as part of this Agreement by reference. If and to the extent this Agreement and the Agreement Documents conflict, the Agreement Documents control.

    1.2.   <u>Battery</u> means the energy storage device and components, *if any*, [to be] installed at the Site.

    1.3.   <u>Battery Storage Capacity</u> means the total electrical storage capacity of the Battery in kilowatt-hours.

    1.4.   <u>Day</u> means, unless otherwise indicated, a calendar day.

    1.5.   <u>Effective Date</u> means the date this Agreement shall be effective; that is, when all Parties hereto have executed the same and delivered counterparts of such signatures to the other Parties.

    1.6.   <u>Final Design</u> means the proposal of the System Size, PV module layout, inverter(s), and estimated yearly production prepared following the Site Survey.

    1.7.   <u>Property</u> or <u>Site</u> means the physical location of the [to be] installed System.

    1.8.   <u>Purchase Amount</u> means the total amount payable by Customer to Company in cash, cash equivalent, or purchase money loan proceeds for Company's performance hereunder. If sales tax is charged on Systems in your area, then such sales taxes are included in the Purchase Amount.

    1.9.   <u>PV</u> means solar photovoltaic.

    1.10.  <u>Site Survey</u> means the on-site inspection of the Property for the installation of the System. The Site Survey is necessary for the preparation of the Final Design.

    1.11.  <u>Substantial Completion</u> means the state of completion of the Work in a good and workmanlike manner in accordance with this Agreement waiting only on final regulatory inspection and interconnection.

    1.12.  <u>System</u> means all PV, Battery, *if any*, and other electrical and structural devices and components [to be] installed at the Site for the generation or generation *and* storage of solar energy. References in this Agreement to *System(s)*, *PV or PV module(s)*, Batter(ies), *inverter(s)*, *device(s)*, *component(s)*, *equipment*, or other terms of similar import shall be construed to be of such number, identification, and composition as the context or the Agreement Documents require or permit.

    1.13.  <u>System Size</u> means the estimated total size of the System array in kilowatts.

    1.14.  <u>System Cost</u> means the total cost of the System, as set forth in the Agreement Documents, including labor, PV modules, Battery, *if any*, and electrical and structural devices and components.

    1.15.  <u>Work</u> means the marketing, sales, electrical and structural review; System design and engineering; procurement of equipment, materials, and authorizations; permitting and licensing; electrical service panel maintenance and upgrades; structural maintenance and upgrades; trenching; A/C relocation; installation of PV modules and inverters, Batteries, and/or other electrical devices and components; System interconnection; and together with all associated labor, equipment, and fees that are reasonable and necessary for System Completion as may be more fully set forth in the Agreement Documents. The Parties

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



agree that the Work is necessary and reasonable for the installation, production, maintenance, durability, and full use and enjoyment of the System.

2. **Scope of Work**. Company shall perform the services, advance fees, costs, and expenses, and furnish the goods to the extent necessary for the proper completion of the Work as may be more fully set forth in the Agreement Documents. Company may contract with third parties, and Customer agrees to accept the Work performed by such third parties. If Company contracts with another party for any of the Work, such contract and performance thereunder satisfy Company's obligations under this Agreement. Where indicated below, Company shall perform the Work using the following equipment or its equivalent:

| Qcells | Enphase IQ8+ Microinverters |
|---|---|

3. [Reserved]

4. **Proposal**. Customer acknowledges that any estimate or proposal provided by Company to Customer for or concerning the purchase and installation of PV or PV plus Battery, *if any*, does not represent a binding agreement, obligation, warranty, guaranty, or representation. Notwithstanding the foregoing, if Customer qualifies for, and fully participates in the Company's BLUEPOWER + FAST TRACK™ program, Company agrees to make payments to Customer in accordance with the terms and conditions set forth in the corresponding BLUEPOWER + FAST TRACK™ proposal provided that Company receives purchase money loan proceeds from the participating lender. The proposed design and installation assumptions of the System are as follows:

| COST ASSUMPTIONS | |
|---|---|
| System Cost: $ 36371 | *IF APPLICABLE, SALES TAX IS INCLUDED IN THE COST* |
| Solar Rebate: $ 0 | |
| Down Payment (if applicable): $ 0 | |
| **PURCHASE AMOUNT: $ 36371** | |
| Federal Tax Credit (30%): $ 10911 | *REBATES, CREDITS & INCENTIVES ASSUME SUCCESSFUL APPLICATION TO A GOVERNMENT OR UTILITY INCENTIVE PROGRAM, EXECUTION AND DELIVERY OF ALL REQUIRED INSTRUMENTS, AND SYSTEM ENERGIZATION* |
| State Incentive: $ 0 | |
| Other Incentive $ . | |
| **NET SYSTEM COST: $ 25460** | |

| PV ASSUMPTIONS | BATTERY ASSUMPTIONS |
|---|---|
| Total System Size (kW): 5.6 | Number of Batteries: 0 |
| Yearly Solar Production (kWh): 6393 | Battery Storage Capacity (kWh): 0 |
| Annual System Degradation: 0.5% | Estimated Backup Duration (days): . |

5. **Final Design**. Company will perform a Site Survey of the Property, and Customer grants Company permission to access, photograph, evaluate, and inspect the Property for various qualifying structural and electrical factors. After the Site Survey, Company design team will prepare and deliver the Final Design to Customer. The Parties understand that the Final Design may be different from the Proposal due to factors and conditions discovered or re-assessed at the Site Survey. The Final Design also sets forth the plans for location of PV modules, Batteries, and other details related to your System.

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



6. **Payment**. If Customer elects to pay the Purchase Amount in cash or cash equivalent, half shall be due upon delivery of the Final Design, with the remaining balance due at Substantial Completion. If Customer will finance the Purchase Amount, Customer agrees that they will obtain financing from Company's preferred lender and make payments to lender in accordance with its terms and conditions. Notwithstanding anything to the contrary, full payment of the Purchase Amount is due at Substantial Completion.

7. **Credit Card Charges**. Where Customer elects to pay the Purchase Amount, or any part thereof, through a credit card or other charge card, 1.25% of the transaction value will be charged to the Customer as a surcharge towards Company's credit card processing fees.

8. **Title and Risk of Loss**. Transfer of title in the System, including all PV, Battery, *if any*, and electrical devices and components, and all risk of loss, damage, or destruction to the System shall occur upon the first instance of the PV module equipment being secured to Customer's roof, or in the case of a Battery, installed in or around the Customer's home.

9. **Security Interest**. Customer acknowledges that the lender, if Customer finances the Purchase Amount, Company, or other tradesman or supplier may take a security interest in the System, or the real property the Work improves, as collateral for Customer's full payment (or repayment) of any amount financed or for Work performed as provided under applicable mechanic's lien statute or in accordance with that separate agreement between Customer and lender or Customer and Company.

10. **Termination**. The following terms and conditions govern any termination of the Agreement or cancellation of the underlying transaction(s):

  10.1.  0–3 Days After Signing: Customer may cancel this Agreement, pursuant to the Notice of Cancellation attached herewith, within three days of signing this Agreement with no penalty or obligation.

  10.2.  0–10 Days After Delivery of the Final Design: Customer has ten days after delivery of the initial Final Design following the Site Survey to cancel this Agreement without any penalty or obligation. Customer may cancel under this scenario by mail or electronic delivering (e-mail) of written notice of cancellation to Company.

  10.3.  After 10 Days of Delivery of the Final Design but Before Installation: Customer recognizes that by signing this Agreement, Company begins expending efforts and resources to add value to Customer by commissioning and paying for a Site Survey, creating permit-quality designs for the System, and otherwise doing the work required to obtain regulatory approval. Accordingly, if Customer cancels this Agreement without cause outside of the cancellation period allowed by law and more than ten days after delivery of the initial Final Design following the Site Survey but before commencement of System installation, Customer shall pay Company a reimbursement fee equal to one thousand two hundred fifteen dollars ($1,215) as compensation for the work, value, and efforts provided by Company to Customer ("Reimbursement Fee"). Notwithstanding the foregoing, Company reserves all available legal and equitable remedies for any breach by Customer including the termination of this Agreement on or after commencement of System installation.

  10.4.  Cancellation by Company: Company may terminate this Agreement, in whole or in part, for convenience, with or without cause. If Company cancels the Agreement without cause, Customer is under no further obligations under this Agreement.

  10.5.  Effect of Termination: In the event of any termination of this Agreement as provided in Sections 10.3 or 10.4 above or Customer breach of this Agreement, Customer shall pay Company for all costs, time, materials, and fees reasonably incurred by Company in the performance of the Work that improves or adds value to the Property, which shall be in addition to the Reimbursement Fee and any other amounts due under the Agreement.

11. **Change Request**. Customer shall pay Company one hundred thirty-seven dollars ($137) for each change to the System that is requested more than ten days after delivery of the initial Final Design following the Site Survey. The requested change (the "Change Order"), *if any*, constitutes an amendment to this Agreement and performance thereunder is subject to mutual acceptance by the Parties. Customer shall make no changes to the Work required to be performed under this Agreement, nor shall Company be under obligation to perform any extra or modified work without a Change

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



Order signed by the Parties describing the changes, the additional compensation, and the extended time, *if any*. Customer acknowledges that additional features, non-standard work, extra work, more PV modules, greater PV production, etc. may result in a higher contract price.

12. **Provision of Goods**. Company may offer to provide certain goods and hardware (collectively, the "Goods") in advance of the final installation of the System. In the event Customer accepts and receives the Goods and later cancels the Agreement, Customer agrees to the following in addition to the terms and conditions stated in the Termination Section above:

    12.1.    In accordance with this Agreement, if cancellation is within the statutory cancellation period or within ten days after delivery of the initial Final Design following the Site Survey, Customer agrees to return the Goods to Company in substantially the same condition in which they were received by Customer. Customer shall pay three hundred fifty dollars ($350) to Company if Customer elects to retain the Goods after previously mentioned cancellation period. All Goods returned or payment for retained Goods shall be made within seven (7) business days of cancellation. If the Goods are not returned and the payment not made, then Company reserves all rights to seek full performance of the Agreement.

13. **Work Schedule**. Company will attempt to keep Customer apprised of estimated timelines associated with installing the System. Customer acknowledges that due to required waiting periods associated with some localities, Customer may not hear from Company for an extended amount of time as there will be no updates to report, and inspectors from the governing jurisdiction may show up without advance warning to Customer, even with Company's best efforts as Company cannot control how governing jurisdictions treat Customer. Company makes no representations regarding the length of time required to begin or complete the System, as regulatory entities, HOAs, and other governing bodies can cause delays in the amount of time necessary. If a sales representative discussed a timeline with Customer, Customer acknowledges such timeline and the timeline provided below is only an estimate that can vary significantly based on factors outside of Company's control, and that Customer will not rely on a timeline estimate. Customer acknowledges and agrees that Company does not control loan interest rates or loan terms and that work schedule and delays may require Customer to reapply for financing, which increase the cost to finance the System.

        1–2 weeks for initial Site Survey;
        1–2 weeks for design and approval;
        1–6 weeks (or longer) for permit submission and approval; and
        1–6 weeks for installation, final inspection, and interconnection (depending on inspection).

14. **Damages Caused by Delay**. To the extent that Customer should commit or omit an act within its control that causes delay to the Work. Customer shall pay Company for its actual costs and expenses, including but not limited to mobilization and labor expenses and loss of business or profit, incurred as a result of such delay.

15. **Previous Work and Unforeseen Conditions**. Customer hereby warrants that all previous improvements, construction, and installations conducted on the Site, including any HVAC, electrical, and structural work, were properly permitted and inspected (collectively, "Previous Work").  Customer agrees to promptly pay any charges, fines, penalties, or other fees reasonably incurred by Company under this Section or levied by a regulatory entity and make any corrections resulting from the discovery of any unpermitted improvements or alterations during the work conducted by Company or any inspections conducted by a government entity. Customer acknowledges that Company cannot reasonably identify or discover all possible inspection or code concerns, and that it is relying on Customer to have properly had all previous work and improvements performed and the Site otherwise up to applicable code. If previous work, concealed, or unknown physical conditions are encountered at the site of the performance of the Work that differ materially from those disclosed by Customer or from those conditions immediately apparent from Site Survey, Company may elect to undertake necessary corrective work and, regardless of whether Company undertakes such work, terms concerning price and schedule shall be subject to equitable adjustment, which corrective work and adjustments shall not require the consent of Customer. Customer acknowledges and agrees that under no circumstance shall Company be liable to Customer, a member of Customer's household, or an invitee of Customer for any loss, damage, injury, or death arising from any Previous Work. If at any time a home construction service requires extra costs above the cost specified or estimated in the Agreement that were reasonably unforeseen, but necessary, and the total of all extra costs to date

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



exceeds five thousand dollars over the course of the entire home construction contract, Customer has a right to an estimate of those excess costs before Company begins work related to those costs. Company will provide this estimate in written form.

16. **Community Association**. Customer agrees to notify Company if there are any CC&Rs, HOAs, or other local restrictions present on the Site. Company relies on Customer for this information and does not do a title search to determine if there are applicable restrictions. Customer accepts all responsibility for working and complying with Customer's HOA, Architectural Control Committee, or other community association body (collectively, the "HOA"), and agrees to be solely responsible for all costs associated with any of these governing bodies, including fines for non-compliance with their requirements. To the extent necessary, Customer hereby authorizes Company to represent Customer before the HOA in connection with Customer's application for System approval. Customer further authorizes and gives permission to the HOA to send, correspond, or communicate with Company concerning Customer's application for System approval. Customer specifically waives any and all claims against the HOA in association with its release of information to Company as authorized herein.

17. **Tree Shade**. Trees on the Property or adjacent property may cast shade on the System thereby lowering System production. Company will use reasonably commercial efforts to identify and take into account tree shade when designing the System. To the extent Company provides a Final Design with production estimates based on material assumptions of certain undertakings of tree relocation, removal, or trimming, Customer hereby releases Company from any claim, complaint, duty, or obligation in any way related to the loss of System production caused by shade from such trees. Further, Customer expressly acknowledges and agrees that any such tree work, whether undertaken by Customer or at Company's direction, shall not be a reason to suspend or delay the scheduling or commencement of System installation or Customer's payment obligations hereunder.

18. **Intended Use and No Obligation to Remove System**.

    18.1.    The System and the Work performed hereunder is intended for the sole use of Customer.  No other person or entity shall be entitled to rely on the services, plans, recommendations, or specifications provided as part of the Work without the written authorization of Company. The System is intended to be installed, and nothing contained in this Agreement obligates Company to remove and replace any part of the System, even to accommodate roof repair or replacement. Customer bears all responsibility, obligation, liabilities, and fair market costs associated with the removal and replacement of the System, even where it is determined that Customer's roof would need to be replaced at some point in the future prior to the installation of the System. For purposes of this Section, fair market cost means the amount charged by the contractor performing the removal or replacement.

    18.2.    In the event Company installs permanent roof anchors as part of its fall protection measures, Customer consents to such installation and acknowledges that it will (i) not be removed at the conclusion of the Work; and (ii) is intended for the sole use of Company in the performance of the Work. Customer acknowledges and agrees that no other person or entity, including Customer, may use or rely on such permanent roof anchors for fall protection or related purposes. Customer, for himself or herself, and for Customer's successors, agents, and assigns, hereby releases Company from any claim or demand relating to any prohibited use or reliance on such permanent roof anchors, *if applicable*.

19. **System Access**. Customer grants Company and their respective employees, agents, independent contractors, and contractors the right to reasonably access all of the Property as necessary performance of the Work and the operation, maintenance, removal, or repair of the System. Following the completion of the Work, Company shall provide Customer with reasonable notice of its need to access the property whenever commercially reasonable. Customer hereby agrees that Company is not responsible for any damage resulting from reasonable entry necessary for the performance of the Work, including but not limited to: sheetrock, paint, wallpaper, flooring, ceilings, walls, cabinetry, etc.

20. **Matching**. Customer acknowledges and agrees that the performance of the Work may result in mismatches between existing material and new or reconfigured material used to repair, replace, or relocate damaged or unwanted material because of  (i) texture;  (ii) color  fading,  oxidation,  and  weathering;  (iii) wear  and  tear,  marring,  scratching,  or

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



deterioration; or (iv) obsolescence or discontinuation. Company will make a good faith effort to match new or reconfigured materials with existing materials; however, under no circumstances shall Company be liable for the loss in value to any property due to mismatch between existing and new or reconfigured materials.

21. **Standard of Work**. Company shall perform its work in a manner consistent with the level of care and skill ordinarily exercised by other members of the profession currently working under similar circumstances and shall only engage others who perform work at the same level of care and skill. Except as expressly provided in Exhibit 1 to this Agreement, Company hereby disclaims, and Customer unconditionally and irrevocably waives and releases, any and all actual or potential rights Customer might have against Company regarding any form of warranty, express or implied, of any kind or type, relating to and concerning the installation, maintenance, and repair of the System or in connection with Customer's eligibility or participation in a government or utility energy credit, rebate, or incentive program. SUCH WAIVER AND RELEASE INCLUDES TO THE FULLEST EXTENT PERMITTED BY LAW, A WAIVER AND RELEASE OF EXPRESS WARRANTIES (EXCEPT THOSE REPRESENTATIONS AND WARRANTIES OTHERWISE EXPRESSLY SET FORTH IN EXHIBIT 1), IMPLIED WARRANTIES, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF MERCHANTABILITY, WARRANTIES OF HABITABILITY, STRICT LIABILITY, RIGHTS AND CLAIMS OF EVERY KIND AND TYPE. Customer acknowledges that Company does not provide a warranty as to the amount the System will offset Customer's utility usage or bill. The System will provide an amount of power that will not increase beyond its manufactured capacity; whereas Customer's usage can increase and decrease depending on factors outside of Company's control. Accordingly, the warranties and guaranties expressly stated in Exhibit 1 only relate to what the System produces and not to Customer's offset.

22. **Remedies**. If Customer does not timely pay the Purchase Amount, Reimbursement Fee, or other amounts Customer is responsible for which are necessary to complete the Work, then Company is released from any further obligations to Customer hereunder, including those warranties and guaranties expressly stated in Exhibit 1. Further, Company may take all steps necessary to collect the amount(s) owing, including, but not limited to: initiating collection attempts, hiring an attorney or collection agency, shutting off the System, reporting the amounts owing to a credit reporting agency, and pursuing all lawful remedies to obtain payment.

23. **Waiver of Subrogation**. Except where prohibited, Company and Customer agree that with respect to any injury or property loss which is covered by insurance then being carried by Company or Customer, respectively, the party carrying such insurance and suffering said loss releases the other, and against the partners, members, officers, employees, agents, and representatives of the other, of and from any and all claims with respect to such loss, and they further agree that their respective insurance companies shall have no right of subrogation against the other on account thereof.

24. **Miscellaneous**.

    24.1. <u>Notices</u>. All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or on the third day after being deposited in the United States mail, postage paid addressed to Company's address or sent by electronic delivery (e-mail) to the address specified most recently by Customer.

    24.2. <u>Further Assurances</u>. Each party agrees to execute and deliver such instruments and take such further action as the other party may, from time to time, reasonably request in order to effectuate the purposes and to carry out the terms of this Agreement.

    24.3. <u>Waiver</u>. The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver of limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

    24.4. <u>Non-Reliance</u>. NO EMPLOYEE OR REPRESENTATIVE OF COMPANY IS AUTHORIZED TO MAKE ANY PROMISE TO CUSTOMER THAT IS NOT CONTAINED IN THIS AGREEMENT CONCERNING COST SAVINGS, SYSTEM PERFORMANCE, TAX BENEFITS, OR GOVERNMENT OR UTILITY INCENTIVES. CUSTOMER AGREES NOT TO RELY UPON ANY PROMISE OR ESTIMATE THAT IS NOT INCLUDED IN THIS AGREEMENT. Customer acknowledges, confirms, and agrees that in entering this Agreement he or she has not relied on any statement, representation, promise, warranty, guaranty, estimate, or proposal

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



made by Company, or any of its respective officers, employees, sales representatives, contractors, agents, or suppliers except as set forth herein.

24.5.  Predominant Language. The English-language version of this Agreement controls and prevails in all aspects in case of inconsistency with the translated version, *if any*. A copy of the English version of this Agreement is available upon written request.

24.6.  Assignment. Company may sell, assign, transfer, convey, or collateralize, by the operation of law or otherwise, any portion of its obligations herein. Company may delegate or subcontract to any person or entity at its sole discretion. Customer shall not assign or delegate any rights or claims under this Agreement without the prior written consent of Company, and any such assignment or delegation shall be null and void.

24.7.  Amendment. This Agreement may only be modified or amended if amendment is made in writing and signed by both Parties.

24.8.  Severability. If any provisions of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

24.9.  Applicable Law. This Agreement shall be governed and construed in accordance with the laws of the State of Utah without regard to conflicts of laws.

24.10. Jurisdiction. BOTH PARTIES AGREE THAT ANY SUIT, ACTION, OR PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY MATTER ARISING OUT OF OR IN CONNECTION WITH, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS OF UTAH, SO LONG AS ONE OF SUCH COURTS SHALL HAVE SUBJECT MATTER JURISDICTION OVER SUCH SUIT, ACTION, OR PROCEEDING, AND THAT ANY CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT SHALL BE DEEMED TO HAVE ARISEN FROM A TRANSACTION OF BUSINESS IN THE STATE OF UTAH, AND EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS AND SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION, OR PROCEEDINGS.

24.11. Waiver of Class Action Lawsuits. YOU AND COMPANY AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION. UNLESS YOU BOTH AGREE OTHERWISE, NEITHER PARTY MAY CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS AGAINST THE OTHER.

24.12. Entire Agreement. This Agreement and all Agreement Documents contain the entire agreement of the Parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement and each and every term and condition hereof, shall inure to the benefit of, and shall be binding upon, the Parties hereto and their respective permitted successors and assigns.

24.13. Counterparts. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which when taken together constitute one and the same Agreement.

25.  **Licenses**. BRS Field Ops, LLC and its subcontractors, suppliers, and independent contractors may be licensed and regulated by the authority in which your System is located.

26.  **Signatures**. Execution of this Agreement may be in the form of an electronic or similar signature, and such signature shall be treated as an original signature for all purposes.

27.  **Assignment of Renewable Energy Credits**. If applicable, Customer hereby absolutely assigns, transfers, and conveys to Company (or its designee), without recourse to Customer, all Customer's rights, title, interest, and duties in and to all proceeds generated by the sale of solar renewable energy credits and certificates generated by the System ("Solar Proceeds"), including all general environmental benefits and attributes of the System, whether currently existing or existing in the future, and regardless of how the Solar Proceeds is registered, on what registry it is listed, or to whom the Solar Proceeds is sold. Where Solar Proceeds are sold or traded separately from the electricity generated by the System for household consumption or exported back to the utility in a process ordinarily referred to as "net metering,"



the assignment of Solar Proceeds under this Section does not assign net metering credits. Customer hereby covenants that it will transfer any and all proceeds generated by the sale of the Solar Proceeds to Company. Consideration for the Assignment of the Solar Proceeds may be used to offset the purchase price or financing cost of the System. Company hereby accepts and assumes the Assignment and the transfer of proceeds as previously described. Except as expressly provided above, the rights, titles, interests, or duties of Customer in and to Solar Proceeds or any proceeds thereof, shall not be assigned, registered, or otherwise transferred by Customer without the prior written consent of Company.

28. **Limitation of Liability**. Except as expressly stated in Exhibit 1, Customer hereby agrees that Company's total liability for any and all injuries, claims, liabilities, losses, costs, expenses, or damages whatsoever, including without limitation, attorneys' fees and costs to Customer and any third party arising out of or in any way related to Company's Work, System installation, or this Agreement, from any cause or causes, including but not limited to, Company's negligence, errors, omissions, breach of contract or any duty, is limited to the lowest amount required by applicable law. Customer agrees that Company and any contracted parties are not liable to Customer for consequential, incidental, punitive, nominal, exemplary, or special damages. In no event shall Company be liable for any difference between estimated savings or payments and actual savings or payments received, or for Customer's failure to achieve a specified amount of savings or payments, in connection with Customer's eligibility or participation in any government or utility energy credit, rebate, or incentive program.

COMPANY PROVIDES NO GUARANTY OR WARRANTY THAT ANY BATTERY INSTALLED PURSUANT TO THIS AGREEMENT WILL BE ABLE TO PROVIDE BACKUP POWER IN WHOLE OR IN PART DURING ANY POWER OUTAGES. BACKUP AVAILABILITY IS SUBJECT TO NUMEROUS FACTORS BEYOND COMPANY'S CONTROL, SUCH AS BATTERY CHARGE CAPACITY OR LOAD DEMAND. AS SUCH, COMPANY DISCLAIMS LIABILITY FOR ANY DAMAGES RESULTING FROM THE UNAVAILABILITY OF BATTERY POWER DURING A POWER OUTAGE, INCLUDING BUT NOT LIMITED TO DAMAGES RELATED TO THE FAILURE OF THE BATTERY TO POWER LIFE SUPPORT OR OTHER MEDICAL DEVICES DURING A POWER OUTAGE. COMPANY PROVIDES NO GUARANTEE THAT THE SYSTEM INSTALLED PURSUANT TO THIS AGREEMENT CAN BE UPGRADED IN THE FUTURE.

29. **Customer Acknowledgement**. Customer hereby acknowledges and agrees that:

29.1. Actual utility rates may go up or down and actual savings, *if any*, may vary. Historical data are not necessarily representative of future results. For further information regarding rates, contact your local utility or the State Commerce Commission or Public Utilities Commission.

29.2. The offset amount is <u>not</u> guaranteed; only the estimated System production used for administering the production guaranties expressly stated in Exhibit 1 is guaranteed.

29.3. Battery backup of electric appliances and length of backup duration is <u>not</u> guaranteed. Where applicable, Customer's own Battery backup and length duration is subject to numerous factors beyond Company's control, such as Battery charge capacity, previous work and unforeseen conditions, Site and Battery location, ambient temperature, household energy consumption, and System production. Some electric appliances may not be compatible with Battery backup.

29.4. Actual savings or payments under government or utility incentive programs are based on estimated and/or actual System size and/or production as calculated by the program administrator in its sole and absolute discretion.

29.5. The System production and size estimates used in this Agreement and the Agreement Documents to anticipate your estimated incentive program savings or payments are <u>not</u> guaranteed. Actual System production may go up and down, those administering the program may calculate System size and/or production differently from Company, and actual savings or payments under the program, *if any*, may vary.

29.6. Except as may be required, savings or payments under government or utility incentive programs are issued directly to Customer. Company will <u>never</u> issue you any such program savings or payments and will <u>never</u> compensate you for any difference between estimated program savings or payments and actual savings or payments received.

29.7. Except as may be required, Customer is solely responsible for ensuring that all required information, documentation, and paperwork for tax and other government or utility energy credits, rebates, or incentives, is obtained and submitted correctly and on-time.

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



29.8.   [Reserved]
29.9.   If you are in a state that allows you to select an electrical supplier, switching suppliers will cancel your net metering and require you to set up new net metering. Depending on the supplier, this can be a lengthy process, and Company is not obligated to assist during such transition. Further, any production guaranties offered in Exhibit 1 are suspended during the time your System is not approved for net metering.
29.10.  Tax and other government or utility incentives vary as to eligibility, participation, and refundability and are subject to change or termination by executive, legislative, or regulatory action, which may impact savings and payments estimates.
29.11.  Approval of your application to any government or utility incentive programs is not guaranteed.
29.12.  You agree to review all tax credits with a tax professional to determine what is actually available to you, and you will not rely on any information from sources other than a tax professional.
29.13.  You will still receive a monthly utility bill.

30. **Customer Data**. Your privacy is important to BRS Field Ops, LLC. For a copy of our Privacy Policy, which covers how we collect, use, disclose, transfer, and store your information, please visit our website at //blueravensolar.com/privacy-policy/ or call 800-377-4480. By initialing below, you acknowledge your receipt of and opportunity to review such Privacy Policy:

Customer Initials: _____G.S._____

**YOU, THE BUYER, MAY CANCEL THIS PURCHASE AT ANY TIME PRIOR TO MIDNIGHT OF *A DATE NOT EARLIER THAN* THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**IN ADDITION TO THE STATUTORY RIGHT TO CANCEL PROVIDED ABOVE, CUSTOMER HAS TEN (10) DAYS AFTER DELIVERY OF THE INITIAL FINAL DESIGN FOLLOWING THE SITE SURVEY TO CANCEL THIS AGREEMENT WITHOUT ANY PENALTY OR OBLIGATION.**

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the Effective Date.

|  |  |
|---|---|
| **BRS FIELD OPS, LLC** | **CUSTOMER** |
| _/Signature_ | _Signature_ |
| Name: Reed Farnsworth | Name: George Strakis |
| Title: President | Date: 03 / 13 / 2024 |
| Date: 03 / 13 / 2024 |  |

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW

## NOTICE OF CANCELLATION

**Transaction Date:** 03 / 13 / 2024

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN 3 BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN 10 BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT REASONABLE TIMES AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MUST IN THE ALTERNATIVE COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF THE SELLER DOES NOT EITHER PROVIDE INSTRUCTIONS FOR THE RETURN OF THE GOOD TO THE SELLER OR PICK THEM UP WITHIN 10 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO:

**BRS FIELD OPS, LLC**
**1403 N. Research Way**
**Orem, UT  84097**

**NOT LATER THAN MIDNIGHT OF** 03 / 23 / 2024 **[***provided this date is not earlier than the Transaction Date plus three business days***].**

I, _____ (print name), HEREBY CANCEL THIS TRANSACTION.

_____
**Customer Signature**

**Date:** _____

IN ADDITION TO THE STATUTORY RIGHT TO CANCEL PROVIDED ABOVE, CUSTOMER HAS TEN (10) DAYS AFTER DELIVERY OF THE INITIAL FINAL DESIGN FOLLOWING THE SITE SURVEY TO CANCEL THIS AGREEMENT WITHOUT ANY PENALTY OR OBLIGATION.

# NOTICE OF CANCELLATION

**Transaction Date:** 03 / 13 / 2024

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN 3 BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN 10 BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT REASONABLE TIMES AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MUST IN THE ALTERNATIVE COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF THE SELLER DOES NOT EITHER PROVIDE INSTRUCTIONS FOR THE RETURN OF THE GOOD TO THE SELLER OR PICK THEM UP WITHIN 10 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO:

**BRS FIELD OPS, LLC**
**1403 N. Research Way**
**Orem, UT  84097**

**NOT LATER THAN MIDNIGHT OF** 03 / 23 / 2024 **[***provided this date is not earlier than the Transaction Date plus three business days***].**

I, _____ (print name), HEREBY CANCEL THIS TRANSACTION.

_____
**Customer Signature**

**Date:** _____

IN ADDITION TO THE STATUTORY RIGHT TO CANCEL PROVIDED ABOVE, CUSTOMER HAS TEN (10) DAYS AFTER DELIVERY OF THE INITIAL FINAL DESIGN FOLLOWING THE SITE SURVEY TO CANCEL THIS AGREEMENT WITHOUT ANY PENALTY OR OBLIGATION.

# Exhibit 1: Limited Warranty and Guaranty

BRS FIELD OPS, LLC is the solar company installing the System and the company responsible for administering the warranties and guaranties under this Limited Warranty and Guaranty.

BRS FIELD OPS, LLC
1403 N. Research Way
Orem, UT  84097
800-377-4480
support@blueravensolar.com
License # _see local municipality_

| COST ASSUMPTIONS | |
|---|---|
| System Cost: $ 36371 | *IF APPLICABLE, SALES TAX IS INCLUDED IN THE COST* |
| Solar Rebate: $ 0 | |
| Down Payment (if applicable): $ 0 | |
| **PURCHASE AMOUNT: $** 36371 | |
| Federal Tax Credit (30%): $ 10911 | *REBATES, CREDITS & INCENTIVES ASSUME SUCCESSFUL APPLICATION TO A GOVERNMENT OR UTILITY INCENTIVE PROGRAM, EXECUTION AND DELIVERY OF ALL REQUIRED INSTRUMENTS, AND SYSTEM ENERGIZATION* |
| State Incentive: $ 0 | |
| Other Incentive: $ · | |
| **NET SYSTEM COST: $** 25460 | |

| PV ASSUMPTIONS | BATTERY ASSUMPTIONS |
|---|---|
| Total System Size (kW): 5.6 | Number of Batteries: 0 |
| Yearly Solar Production (kWh): 6393 | Battery Storage Capacity (kWh): 0 |
| Annual System Degradation: 0.5% | Estimated Backup Duration (days): · |

**ADDITIONAL DISCLOSURES:**

[X]    If this box is selected, Customer agrees to the assignment of renewable energy credits according to the terms and conditions of the Agreement.

[X]    If this box is selected, the pricing terms above will not change if the System is not selected for a government or utility incentive program.

Company will not perform regular maintenance and repairs on the System.

**COMPANY WARRANTS AS FOLLOWS:**

1. **Limited Warranty**.

(a)    Workmanship. Company, for a period of ten (10) years from installation, warrants that the System will be designed, engineered, and constructed to meet the requirements of this Agreement and is capable of operating free of major defects and in accordance with all System manufacturer specifications. Company further warrants that the System, and each device and component of the System incorporated therein, will be new or equivalent to new, will be of suitable grade of their respective kinds for their intended use as specified herein, and shall conform in all respects to all applicable requirements of applicable laws, all governmental approvals, the plans and specifications prepared in accordance with this Agreement and all descriptions set forth herein, applicable engineering and construction codes and standards, and all other requirements of this Agreement.

v.26.01                                    i

(b)    Roof. Company, for a period of ten (10) years from installation, warrants that, with respect to all roof penetrations made by Company, such roof penetrations, limited to three (3) inch radius of the roof penetration, shall be free from material defects in workmanship and shall be sealed or flashed to eliminate any liquid or vapor penetration, and that such roof penetrations shall not affect or otherwise diminish the strength, integrity, water-proofing, or balance of any underlying roof structure.

(c)    Equipment. Company warrants that the PV and Battery, *if any*, devices and components (the "Equipment") installed under this Agreement will be made from new or equivalent to new parts with industry standard warranties. The Equipment will carry the manufacturer's warranty as specified by the manufacturer on their website. Company shall assign all Equipment warranties to Customer. Subject to and on condition that notice of defect was given to Company within two (2) years from installation and manufacturer actually repairs and/or replaces the Equipment, Company shall furnish all reasonable labor and materials necessary to accomplish the required repair and/or replacement of the defective item. To the extent that manufacturer repairs and/or replaces the Equipment after two (2) years from installation, Customer acknowledges and agrees to furnish and bear the cost of all labor and materials necessary to accomplish the required repair and/or replacement of the defective item, unless otherwise provided by manufacturer warranty. Company makes no warranty, express or implied, concerning the Equipment except as provided herein.

2.    **PV Guaranty**.

(a)    For purposes hereof, the term "Guaranty Period" shall mean a period of two (2) years from the final completion of Customer's System.

(b)    If, for any consecutive three (3) month period during the Guaranty Period, the actual System output, as measured in kWh by the System's monitoring system ("Actual System Output"), is more than fifty percent (50%) below the projected total in kWh of the "Estimated System Output" for the same three (3) month period, as set forth in the Final Design related to the System, Company shall be obligated to cure any shortfall such that Actual System Output is within ten percent (10%) of Estimated System Output going forward. If your residence is not able to support additional panels for any reason, Company shall pay you the present value of the difference in what the utility cost should have been to you versus what it was to you due to the shortfall less ten percent as projected over a two (2) year period. Company is not obligated to compensate for any additional usage beyond the amounts set forth in the Final Design.

(c)    If, for any continuous eighteen (18) month period during the Guaranty Period, the Actual System Output is more than fifteen percent (15%) below the projected total in kWh of the Estimated System Output for the same eighteen (18) month period, as set forth in the Final Design, Company shall be obligated to cure any shortfall such that Actual System Output is within ten percent (10%) of Estimated System Output going forward. If your residence is not able to support additional panels for any reason, Company shall pay you the difference in what the utility cost should have been versus what it was to you due to the shortfall, less ten percent, over the Guaranty Period. Company is not obligated to compensate for any additional usage beyond the amounts set forth in the Final Design.

(d)    *Notwithstanding the foregoing*, Company shall have no obligation with respect to the Guaranty provided herein to the extent Customer does not have adequate cellular or internet coverage as required by the approved monitoring platform or Company is otherwise unable to monitor Actual System Output. Further, Company shall have no obligation with respect to the foregoing Guaranty for any loss of System production relating to tree shade where the relocation, removal, or trimming of such trees was a material assumption of the Estimated System Output. **For the avoidance of doubt, Company is not responsible for keeping the System free of dirt, snow, debris, and/or critter infestation**.

3.    **Warranty and Guaranty Administration**.

(a)    Unless otherwise provided, Company's warranty and guaranty obligation stated herein are limited to those defects or deficiencies which become apparent within the applicable warranty or Guaranty Period set forth above.

(b)    If Company's warranty or guaranty obligations stated herein are breached, or a defect or deficiency covered by Company is discovered during the applicable warranty or Guaranty Period set forth above, upon notice to Company, Company shall promptly repair, replace, correct the deficiency, and/or agree to an equitable price adjustment.

(c)    All reasonable labor and material costs necessary to Company's performance of its warranty and guaranty obligations shall be borne by Company.

4.    **Warranty and Guaranty Exclusions**. The warranty and guaranty obligations stated herein do not extend to:

(a)    Eligibility or participation in a government or utility energy credit, rebate, or incentive program.

(b)     Damage, malfunction, or degradation of electrical output or System performance caused by or resulting from:

      i.    Customer's failure to properly operate or maintain the System, and system components, in accordance with manufacturer's published instructions available online;

      ii.   Any repair, replacement, modification, enhancement, or reinstallation of the System or any part thereof using a part or service not provided or authorized;

      iii.  An accident, alteration, negligence, vandalism, or other misconduct by Customer, subsequent owner or any third party, including, but not limited to, damage from golf balls, objects from others, or other impacts caused by persons; earthquake, fire, flood, or other acts of God; excessive heat or excessive cold where Battery is located; or snow covering or a snow load damaging the System; and

      iv.  A power or voltage surge caused by someone other than Company including, without limitation a grid supply voltage outside of standard rage specified by your local utility or the System specifications or as a result of a local power outage or curtailment.

(c)     Except when installed by Company under agreement, electricity storage equipment such as batteries, battery cables, charge controllers, and battery management electronics, and any damage, malfunction, or reduced production in any way caused by or associated with the failure or non-performance, for any reason, of such electricity storage equipment.

(d)     Any roof performance issues:

      i.    not related to roof penetration made as part of the installation of the System; or

      ii.   otherwise covered by Customer's homeowner's insurance.

(e)     Loss of System production from tree shade where the relocation, removal, or trimming of such trees was a material assumption of the Estimated System Output.

(f)     Use of a Battery installed pursuant to this Agreement as the primary or backup source for medical equipment.

(g)     Any pre-existing conditions existing any time prior to installation. Company is not obligated to warranty or guaranty any pre-existing conditions of Customer and is fully released from all liability associated with such pre-existing conditions, including, but not limited to, poor roof conditions.

(h)     Company's warranty and guaranty obligations cease if the System is removed and replaced for roof work or other purposes, or if the System is serviced by unauthorized service providers. The warranty and guaranty obligations also do not transfer to new properties purchased by Customer, even if Customer takes the System to the new property.

(i)     Any Company and/or manufacturer warranty and guaranty obligations concerning Batteries installed pursuant to this Agreement shall cease if such Battery is charged from any source other than your PV modules.

(j)     COMPANY PROVIDES NO GUARANTY OR WARRANTY THAT ANY BATTERY INSTALLED PURSUANT TO THIS AGREEMENT WILL BE ABLE TO PROVIDE BACKUP POWER IN WHOLE OR IN PART DURING ANY POWER OUTAGES.  COMPANY PROVIDES NO GUARANTEE THAT ANY BATTERY INSTALLED PURSUANT TO THIS AGREEMENT CAN BE UPGRADED IN THE FUTURE.

5.     **Transfer of Warranties/Guarantees**. Company will accept and honor any valid and properly submitted claim under this Limited Warranty and Guaranty made during the applicable warranty or guarantee period by any bona fide person to whom Customer properly transfers ownership to the System by way of conveyance of the underlying real property.

[*Remainder of Page Intentionally Left Blank*]

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|--------|-----------|-----------|
| **George Strakis**<br>Email: strakisgeorge@me.com | | |

| | | |
|---|---|---|
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |

**Recipient Verification:**

✓ Email verified          13 Mar 2024 17:33:42 UTC

IP address: 99.149.26.146
Location: Indianapolis, United States

Document completed by all parties on:
13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 50,000+ companies worldwide.





# What is the Renewable Energy Investment Tax Credit Program?

The federal residential renewable energy tax credit (RRETC) program, authorized under 26 USC § 25D, encourages the residential use of renewable energy by providing a federal tax credit to owners of solar energy generators that meet certain performance and quality standards.

The RRETC tax credit is a non-refundable, dollar-for-dollar reduction in the federal income taxes you may owe. Think of it like an IRS coupon that reduces the amount you pay the federal government. For example, claiming a $1,000 RRETC federal tax credit would reduce your federal income tax liability by $1,000. This is a non-refundable tax credit, which means you will not get a tax refund for the amount of the tax credit that exceeds your tax liability. It is important to understand that you can carry over any unused portion of the RRETC tax credit to the next tax year for up to four years. You must have sufficient tax liability in order to take advantage of the full federal RRETC. The only way you would get a refund from the government is if the amount of taxes withheld from you exceeded the amount that you owed, less the RRETC credit amount. In other words, this incentive is a credit towards taxes that are paid or owed to the government. While most customers who qualify for BLUEPOWER® have a large enough tax liability to take full advantage of the RRETC tax credit, you should consult your tax advisor for advice on your specific situation.

# Tax and Legal Advice Disclaimer

**THIS MATERIAL HAS BEEN PREPARED FOR INFORMATIONAL PURPOSES ONLY. IT DOES NOT CONSTITUTE PROFESSIONAL TAX OR LEGAL ADVICE AND SHOULD NOT BE RELIED ON AS THE ONLY SOURCE OF INFORMATION WHEN MAKING PURCHASING, INVESTMENT, OR TAX DECISIONS OR WHEN EXECUTING THIS OR OTHER BINDING DOCUMENTS.**

**TAX AND OTHER FEDERAL, STATE, AND LOCAL INCENTIVES VARY AS TO REFUNDABILITY AND ARE SUBJECT TO CHANGE OR TERMINATION BY LEGISLATIVE OR REGULATORY ACTION, WHICH MAY IMPACT SSAVINGS ESTIMATES. CONSULT A TAX AND LEGAL PROFESSIONAL FOR MORE INFORMATION.**

The information contained herein is general in nature and is based on information estimates provided you, demographic, regional, and industry assumptions, and from other sources that are subject to change. The Company guarantees neither the accuracy nor completeness of any information obtained from outside sources and is not responsible for any errors or omissions or for results obtained by you or others in reliance upon such information. The Company assumes no obligation to inform you of any changes in tax laws or other factors that could affect information contained herein. This information does not, and is not intended to, provide legal, tax, or accounting advice. You should consult your tax advisor concerning the application of tax laws to your particular situation.

Customer Initials: _G.S._____



# M-RETS OPERATING SYSTEM
# TERMS OF USE SCHEDULE A

## LAST MODIFIED ON December 28, 2017
### Generator Owner's Designation of Responsible Party

The undersigned on behalf of the Generator Owner, ___George Strakis___, represents to M-RETS, Inc. ("M-RETS") that:

1. I/we am/are the Generator Owner who holds legal title to the Generating Unit(s) designated below.

2. I/we the Generator Owner hereby designate ___CSG Aggregation___ as the Responsible Party with respect to the Generating Unit(s) listed below. The designation made hereunder expires on ___12/31/2048___.

3. I/we the Generator Owner further represents that I/we have not granted similar authority or permission to any other Subscriber or Account Holder for use in the M-RETS System or any similar system.

Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the M-RETS Operating System Terms of Use and M-RETS Operating Procedures.

| Generating Unit Name and Address [Generating Unit Size/System Size] | ID or EIA Plant Code and Generator Identifier (as applicable) | Meter ID |
|---|---|---|
| George Strakis<br><br>1027 East Brunswick Avenue, Indianapolis, Indiana, 46227 | | |

## RESPONSIBLE PARTY

Name: ___Kelcy Kline___

Title: ___SREC Aggregation Manager___

Company Name: ___Carbon Solutions Group, LLC___

Address: ___2045 W Grand Ave Ste B, PMB #58751___

Address 2: ___Chicago, IL 60612___

Date: ___03 / 13 / 2024___

Signature ___Kelcy Kline___
88A9E1002A4A40E...

## GENERATOR OWNER[3]

Name: ___George Strakis___

Title: ___Homeowner___

Company Name: ___N/A___

Address: ___1027 East Brunswick Avenue, Indianapolis, Indiana, 46227___

Address 2: _____

Date: ___03 / 13 / 2024___

Signature ___George Strakis___

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|---|---|---|
| **George Strakis**<br>Email: strakisgeorge@me.com | | |

| | | |
|---|---|---|
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |

**Recipient Verification:**

✓ Email verified           13 Mar 2024 17:33:42 UTC

IP address: 99.149.26.146
Location: Indianapolis, United States

Document completed by all parties on:
13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



# Exhibit B
# (State Court Record)

This is not the official court record. Official records of court proceedings may only be obtained directly from the court maintaining a particular record.

## George Strakis v. Blue Raven Solar LLC, BRS Field Ops LLC d/b/a Blue Raven Solar

| Case Number | 49D05-2512-PL-056607 |
|---|---|
| Court | Marion Superior Court 5 |
| Type | PL - Civil Plenary |
| Filed | 12/01/2025 |
| Status | 12/01/2025 , Pending (active) |

## Parties to the Case

**Defendant**  Blue Raven Solar LLC

<u>Address</u>
c/o Corporation Service Company, Registered Agent
135 N. Pennsylvania Street, Suite 1610
Indianapolis, IN 46204

<u>Attorney</u>
Kimberli Antoinette Williams
*#3280245, Retained*

Quarles & Brady LLP
135 N Pennsylvania Street
2400 BMO Building
Indianapolis, IN 46204
317-957-5000(W)

**Defendant**  BRS Field Ops LLC d/b/a Blue Raven Solar

<u>Address</u>
1403 North Research Way
Orem, UT 84097

<u>Attorney</u>
Kimberli Antoinette Williams
*#3280245, Retained*

Quarles & Brady LLP
135 N Pennsylvania Street
2400 BMO Building
Indianapolis, IN 46204
317-957-5000(W)

**Plaintiff**      Strakis, George

<u>Attorney</u>
Grover B Davis
*#440849, Lead, Retained*

McClure McClure & Davis
6602 E. 75th Street
Suite 112
Indianapolis, IN 46250
317-221-0800(W)

<u>Attorney</u>
Scott Stephen Mandarich
*#3444449, Retained*

6602 E 75TH ST
STE 112
Indianapolis, IN 46250
317-221-0800(W)

## Chronological Case Summary

| 12/01/2025 | **Case Opened as a New Filing** |
|---|---|

| 12/01/2025 | **Complaint/Equivalent Pleading Filed** | |
| | Exhibit A - Contract.pdf | |
| | Complaint.pdf | |
| | Complaint | |
| | Filed By: | Strakis, George |
| | File Stamp: | 12/01/2025 |

| 12/01/2025 | **Subpoena/Summons Filed** | |
| | Summons - Blue Raven Solar LLC | |
| | Filed By: | Strakis, George |
| | File Stamp: | 12/01/2025 |

| 12/01/2025 | **Subpoena/Summons Filed** | |
| | Summons - BRS Field Ops LLC | |
| | Filed By: | Strakis, George |
| | File Stamp: | 12/01/2025 |

| 12/01/2025 | **Appearance Filed** | |
| | Appearance for Plaintiff | |
| | For Party: | Strakis, George |
| | File Stamp: | 12/01/2025 |

| 12/08/2025 | **Service Issued** | |
| | SUMMONS | |
| | Serve To: | Blue Raven Solar LLC |

| 12/17/2025 | **Service Returned Served** | |
| | corp service at 135 n. penn. st. #1610 46204 27425 | |
| | Party Served: | Blue Raven Solar LLC |

| 01/07/2026 | **Notice Filed** | |
| | Notice of Appearance | |
| | Filed By: | Blue Raven Solar LLC |
| | Filed By: | BRS Field Ops LLC d/b/a Blue Raven Solar |
| | File Stamp: | 01/06/2026 |

| 01/07/2026 | **Notice Filed** | |
| | Notice of Enlargement of Time Under T.R. 6(B) | |
| | Filed By: | Blue Raven Solar LLC |
| | Filed By: | BRS Field Ops LLC d/b/a Blue Raven Solar |
| | File Stamp: | 01/06/2026 |

## Financial Information

\* Financial Balances reflected are current representations of transactions processed by the Clerk's Office. Please note that any balance due does not reflect interest that has accrued – if applicable – since the last payment. For questions/concerns regarding balances shown, please contact the Clerk's Office.

**Strakis, George**

Plaintiff

**Balance Due** (as of 01/14/2026)

0.00

### Charge Summary

| Description | Amount | Credit | Payment |
|---|---|---|---|
| Court Costs and Filing Fees | 260.00 | 0.00 | 260.00 |

### Transaction Summary

| Date | Description | Amount |
|---|---|---|
| 12/01/2025 | Transaction Assessment | 260.00 |
| 12/01/2025 | Electronic Payment | (260.00) |

| This is not the official court record. Official records of court proceedings may only be obtained directly from the court maintaining a particular record. |
|---|

1/14/26, 5:04 PM
Case 1:26-cv-00092-JPH-MJD
Case Summary / MyCase
Document 2-3
Filed 01/16/26
Page 57 of 112 PageID
#:567

STATE OF INDIANA        )        IN THE MARION SUPERIOR/CIRCUIT COURT
                        ) SS:
COUNTY OF MARION        )        CAUSE NO.:


GEORGE STRAKIS                                    )
                                                  )
            Plaintiff,                            )
                                                  )
    v.                                            )
                                                  )
BRS FIELD OPS, LLC, d/b/a                         )
BLUE RAVEN SOLAR, and                             )
BLUE RAVEN SOLAR, LLC                             )
                                                  )
            Defendants.                           )


## <u>COMPLAINT</u>

Plaintiff, George Strakis ("Plaintiff"), by counsel, for his Complaint against Defendants BRS FIELD OPS, LLC d/b/a Blue Raven Solar and Blue Raven Solar, LLC (collectively "Defendants") states:


## <u>PARTIES</u>

1.    George Strakis is a resident of Indianapolis, Marion County, Indiana, and is the owner of the residential real estate located at 1027 E. Brunswick Avenue, Indianapolis, IN 46227 (the "Property") that is subject to this action.

2.    Blue Raven Solar, LLC ("Blue Raven") is a foreign limited liability company authorized to do business in Indiana, with a principal business address located at 1403 N. Research Way, Orem, UT. Blue Raven markets, sells, and coordinates the installation of residential solar systems throughout Indiana.

3.      BRS Field Ops, LLC ("BRS Field Ops") is a foreign limited liability company formerly authorized to do business in Indiana, with a principal business address located at the same Utah address used by Blue Raven. BRS Field Ops served as the contracting and installation affiliate for Blue Raven in Indiana and executed customer contracts on behalf of or for the benefit of Blue Raven.

4.      At all relevant times, Blue Raven and BRS Field Ops operated as a unified business enterprise, shared common management, listed the same Utah business address, and held themselves out to Indiana consumers as a single integrated provider of residential solar services.

5.      At all relevant times, Blue Raven and BRS Field Ops jointly participated in, controlled, or benefitted from the representations, contracting activities, installation services, and customer interactions giving rise to this action.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the parties because Defendants regularly conduct business within Indiana, have transacted business in Indiana by marketing, contracting for, and installing residential solar systems, and committed the acts and omissions giving rise to this action within Indiana.

7.      Venue is proper in Marion County, Indiana under Indiana Trial Rule 75 because the real estate that is the subject of this action is located in Marion County, the installation and misrepresentations occurred there, and Plaintiff resides in the same county.

## FACTUAL ALLEGATIONS

8.      On or around March 13, 2024, Plaintiff contracted with BRS FIELD OPS, doing business as Blue Raven Solar, for the installation of a residential solar panel system on the roof of the Property. A true and accurate copy of the contract ("Contract") between Plaintiff and BRS FIELD OPS is attached to this Complaint as Exhibit A.

9.      The Contract required Blue Raven to conduct a Site Survey of the property for the purpose of determining whether the roof was structurally suitable for solar installation.

10.     The Contract further provided that, in addition to the statutory three-day right to cancel, Plaintiff had ten (10) days after delivery of the initial Final Design following the Site Survey to cancel the Agreement without penalty or obligation.

11.     Pursuant to the Contract, Blue Raven conducted the Site Survey and pre-installation inspection of the Property for the purpose of determining whether the roof was structurally sound and suitable to support the installation of the solar system.

12.     Following the Site Survey, Blue Raven delivered the Final Design to Plaintiff. Neither the Site Survey nor the Final Design disclosed any structural deficiencies, damaged decking, compromised rafters, or other conditions that would render the roof unsuitable for installation. As a result of Blue Raven's representations that the roof was structurally sound enough to support the solar

panels, Plaintiff did not exercise his contractual ten-day right to cancel the Agreement after receiving the Final Design.

13.    On April 26, 2024, Blue Raven installed the solar panel system on Plaintiff's roof. Plaintiff did not receive any report or communication from Blue Raven indicating that installers observed damaged decking, stepped through roof boards, or encountered any conditions requiring repair before installation.

14.    In March 2025, Plaintiff's son returned to the Property and observed significant interior water damage in the bedroom and closet directly below the area where the solar panels were installed. The damage included ceiling staining, moisture accumulation, drywall deterioration, and mold growth.

15.    Plaintiff contacted Blue Raven to report the issue. Blue Raven assigned a work-order specialist and scheduled an inspection, which occurred on or about March 26, 2025. During that visit, Blue Raven's technician acknowledged moisture in the attic and attributed the issue to leaking roofing nails. The technician stated that a roofing specialist would be scheduled for a further assessment.

16.    Plaintiff was informed that a roofing specialist visit was scheduled for April 11, 2025. No representative appeared for that appointment. When Plaintiff contacted Blue Raven's main office, Plaintiff was informed for the first time that Blue Raven was declining responsibility for the condition of the roof and asserting that the structural and moisture-related issues were "pre-existing."

17.     Following this communication, Plaintiff contacted his homeowner's insurance carrier to conduct an independent inspection. The insurance inspector identified broken roof decking directly beneath the solar panel installation area, as well as additional roof-related deterioration and moisture intrusion.

18.     On April 24, 2025, Priority Home Solutions performed a comprehensive roofing assessment. Based on its inspection, Priority Home Solutions concluded, among other things, that:

a.  The roofing system exhibited compromised shingles, deteriorated components, and structural damage beneath the solar panel installation area;

b.  A section of roof decking directly under the solar panels was broken in a manner consistent with someone stepping through the decking during installation;

c.  The extent of roof deterioration required a full roof replacement; and

d.  No severe weather events had occurred between the installation date and the discovery of damage.

19.     Priority Home Solutions further documented that the existing roofing system consisted of a 30-year dimensional shingle that was nearing or had surpassed its expected life span. The inspection further noted age-related deterioration, including non-sealed shingle tabs, fiber exposure, thermal cracking, and other characteristics consistent with an aged or failed roofing

system. A roof in such condition generally requires repair or replacement prior to the installation of a solar panel system, and such conditions should have been observed and disclosed during Blue Raven's Site Survey.

20.    Further, it was determined that the preexisting roof consisted of spaced decking and shingles without any solid decking, which was consistent with older construction standards and building codes. These older construction standards, lacking proper roof decking and reinforcement, were not designed to support the weight or mounting requirements of modern solar panel systems, a fact that was or should have been known to Blue Raven prior to its installation of the solar panel system.

21.    Priority Home Solutions also determined that moisture intrusion affected the attic insulation, drywall, and interior finishes, necessitating insulation removal, mold-related remediation, and drywall repair.

22.    At no time prior to installation did Blue Raven disclose any concerns regarding the structural integrity of the roof or its suitability for installing the solar system. At no time during installation did Blue Raven notify Plaintiff of any damaged decking, compromised structure, or condition requiring remediation.

23.    Plaintiff reasonably relied upon Blue Raven to identify and disclose any structural concerns during the Site Survey and to design the system only if the roof was suitable for installation. Plaintiff further relied upon Blue Raven's silence and failure to report any roof-integrity issues, and accordingly did not exercise his contractual right to cancel the Agreement following delivery of the Final Design.

24. Following the discovery of the water intrusion, structural deterioration, and roof damage described above, Plaintiff contracted with Priority Home Solutions to perform the necessary roof replacement and associated remedial work, including removal of damaged materials, installation of new roofing, and remediation of attic mold and interior ceiling damage.

25. Priority Home Solutions immediately installed an emergency tarp covering at a cost of approximately $1,200.00. This mitigation was necessary to prevent additional damage while Plaintiff sought total repair estimates.

26. In addition to the emergency tarp costs, the total cost of the roof replacement and associated remedial work was $61,662.98, which Plaintiff paid in order to restore the property to a safe and habitable condition.

27. In order for the roof replacement to be completed, the existing solar panels had to be removed and later reinstalled. Blue Raven ultimately agreed to remove and reinstall the solar panels to permit roofing work, but nevertheless charged Plaintiff $5,000.00 for the removal and reinstallation. This charge was incurred even though the need to remove the panels resulted directly from the roof damage caused by Blue Raven's installation.

28. After Priority Home Solutions completed the roof replacement, Blue Raven returned to the property to reinstall the solar panel system. During the course of the reinstallation process, new damage occurred to portions of the newly installed roofing, including torn or displaced shingles and other conditions requiring additional repair.

29.   Plaintiff notified Blue Raven of the new damage observed during or following the reinstallation process. Despite this notification, Blue Raven declined to accept responsibility for the additional damage to the newly installed roof.  Blue Raven's formal denial of responsibility only came after repeated delays and promises that they would evaluate the damage, which they never did.

30.   Plaintiff has not yet proceeded with repairs to the newly discovered damages because doing so would again require removal of the solar panels—an additional $5,000.00 expense to Blue Raven—and then completion of the roofing work estimated at $3,200.00 by Priority Home Solutions. Plaintiff further understands that the newly affected portions of the roof may no longer qualify for the full 50-year warranty coverage previously provided due to the new damage and the panel reinstallation.

31.   In addition to the new repairs, since the reinstallation of the solar panels, the solar panels are now longer functioning correctly and are consistency returning less solar energy than they were prior to the reinstallation. As a result, Plaintiff is no longer getting the energy savings which should come with solar panel use, thus negating the purpose of the panels entirely.

## COUNT I
## FRAUD IN THE INDUCEMENT

32.   Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

33. The Contract required Blue Raven to conduct a Site Survey to determine whether the property's roof was structurally suitable for installation of a residential solar system

34. The Contract provided Plaintiff with ten (10) days after delivery of the Final Design, following the Site Survey, to cancel the Agreement without penalty.

35. Blue Raven failed to disclose material facts regarding the suitability and condition of the roof, including that the roofing system was nearing or had surpassed its expected life span, that the roof was not structurally capable of handling the solar panels, or that the roof exhibited deterioration affecting its ability to support the installation.

36. The condition and suitability of the roof constituted material facts affecting the consumer transaction.

37. Blue Raven knew or reasonably should have known that the roof conditions made installation unsafe or inappropriate and that nondisclosure of these facts would mislead Plaintiff.

38. Blue Raven's omission of material information prevented Plaintiff from exercising his contractual right to cancel the Agreement after receipt of the Final Design.

39. Plaintiff reasonably relied on Blue Raven's nondisclosure and proceeded with the installation believing the roof was suitable.

40.     As a direct and proximate result, Plaintiff sustained damages including the cost of roof replacement, interior repairs, mold remediation, and related losses.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count I, award all damages proximately caused by Defendants' fraudulent inducement, including compensatory damages, pre- and post-judgment interest, attorney's fees and costs as permitted by law, and all other just and proper relief.

## COUNT II
## FRAUD

41.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

42.     During installation on April 26, 2024, a section of roof decking directly beneath the solar array was broken in a manner consistent with someone stepping through the decking.

43.     Blue Raven knew or reasonably should have known of this damage during installation, as such damage would have been visible and apparent to installers performing if not caused by the installers themselves.

44.     Blue Raven failed to disclose this damage to Plaintiff and instead continued with installation.

45.     Blue Raven possessed superior knowledge of the conditions discovered or created during installation and had a duty to disclose such material facts.

46.     Blue Raven's failure to disclose constituted actual fraud or, in the alternative, constructive fraud based on its superior knowledge and the trust Plaintiff placed in its professional expertise.

47.     Plaintiff relied on Blue Raven's representations and/or omissions suggesting that the installation was successful and without issue.

48.     As a direct and proximate result, Plaintiff suffered structural damage, water intrusion, interior deterioration, mold growth, and significant remediation costs.

WHEREFORE Plaintiff respectfully requests that the Court enter judgment in his favor on Count II, award all damages resulting from Defendants' failure to disclose installation-related damage, including compensatory damages, consequential losses, interest, costs, attorney's fees as allowed by law, and all other just and proper relief.


## COUNT III
## BREACH OF CONTRACT

49.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

50.     Plaintiff entered into a valid and enforceable Home Improvement Contract with BRS Field Ops, LLC d/b/a Blue Raven Solar.

51.     Blue Raven breached the Agreement by:

a. Failing to identify and disclose roof conditions affecting suitability;

b. Installing the system on a deteriorated or structurally unsound roof;

c. Causing damage to the roof decking and shingles during installation and reinstallation;

d. Failing to reinstall the system without causing further damage after roof replacement; and

e. Failing to honor its warranty obligations concerning roof penetrations and installation work.

52. Plaintiff fully performed his obligations under the Contract.

53. As a direct and proximate result of Blue Raven's breaches, Plaintiff incurred substantial damages, including the cost of roof replacement, interior repairs, mold remediation, additional roof repairs after reinstallation, and diminished performance of the solar system.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count III, award compensatory damages for Defendants' breach of the Agreement, including the full cost of repairs and related consequential damages, together with pre- and post-judgment interest, costs of this action, and all other just and proper relief.

## COUNT IV
## NEGLIGENCE

54. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

55.     Blue Raven owed Plaintiff a duty to exercise reasonable care in evaluating roof suitability, performing the Site Survey, installing the solar system, and reinstalling the system after roof replacement.

56.     Blue Raven breached its duty of care by:

    a.  Failing to conduct a reasonable and competent Site Survey;

    b.  Failing to identify or disclose obvious roof deterioration or structural concerns;

    c.  Installing the system on a roof that was at or beyond its expected lifespan;

    d.  Creating or failing to disclose damage to the roof decking during installation;

    e.  Causing new damage to the roof during reinstallation; and

    f.  Failing to remedy or properly report issues known or reasonably discoverable

57.     As a direct and proximate result, Plaintiff suffered damages including roof failure, water intrusion, interior damage, mold growth, and related expenses

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor on Count IV, award compensatory damages for all losses proximately caused by Defendants' negligence, including property damage, remedial costs, and loss of use, together with interest, costs, and all other just and proper relief.

## COUNT V
## VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT

58.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

59.    Blue Raven is a "supplier" engaged in a "consumer transaction" as defined by Ind. Code § 24-5-0.5-2.

60.    Under Ind. Code § 24-5-0.5-3, a supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.

61.    Blue Raven committed one or more "deceptive acts" in violation of Ind. Code § 24-5-0.5-3, including:

   a.   Misrepresenting or implying that the roof was suitable for installation;

   b.   Failing to disclose material facts necessary to prevent its representations from being misleading, including roof age, deterioration, and structural concerns;

   c.   Failing to disclose installer-caused roof damage during installation;

   d.   Misrepresenting the cause of water intrusion as "roofing nail leaks";

   e.   Promising to provide a roofing specialist inspection, then denying responsibility;

   f.   Refusing to remedy known or reasonably discoverable installation-related damage; and

g.  Misrepresenting the quality, characteristics, or benefits of its

installation services.

57.    Blue Raven's deceptive acts were uncured and incurable as Blue

Raven denied responsibility and refused to correct the underlying conditions.

58.    As a result of these deceptive acts, Plaintiff suffered actual

damages, including roof replacement, interior repairs, mold remediation,

additional repair costs after reinstallation, and loss of use of portions of the

home.

59.    Plaintiff is entitled to the remedies provided under Ind. Code § 24-

5-0.5-4, including treble damages, attorney's fees, costs, and all other

appropriate relief.

WHEREFORE, Plaintiff respectfully requests that the Court enter

judgment in his favor on Count V, award actual damages, treble damages as

authorized by Ind. Code § 24-5-0.5-4, reasonable attorney's fees and costs,

interest, and all other relief the Court deems just and proper.


Respectfully submitted,

*/s/ Scott S. Mandarich*
Grover B. Davis, 4408-49
Scott S. Mandarich, 34444-49
MCCLURE MCCLURE & DAVIS
6602 E. 76th Street, Ste. 112
Indianapolis, Indiana 46250
Telephone:  317-221-0800
gbdavis@gbd.law
smandarich@gbd.law

MCCLURE MCCLURE & DAVIS
6602 E. 75th Street, Suite 112
Indianapolis, Indiana 46250
Telephone: 317-221-0800
gbdavis@gbd.law
smandarich@gbd.law

Filed 05/30/2025 1:16 PM
Clerk
Marion County, Indiana
Marion Superior Court 5





# Homeowner's Insurance Addendum
# Third Party Authorization to Release Information

Homeowner Name  George Strakis

Property Address  1027 East Brunswick Avenue, Indianapolis, Indiana, 46227

Phone  3172017937                                    Email  strakisgeorge@me.com

With my signature below, I authorize the following contractor to contact my homeowner's insurance provider and to request and receive a copy of the declarations page of my homeowner's insurance policy and any other relevant information for the purpose of contractor submitting on my behalf for residential solar interconnection through my utility company.

The contractor submitting my interconnection application and performing the installation of my rooftop photovoltaic solar system is:

Contractor Name:  BRS Field Ops, LLC

Address:  1403 N. Research Way
          Orem, UT  84097

FEIN:  81-4452370
Phone:  800-377-4480
Fax:  385-265-5041 (Send ATTENTION to "Support")
Email:  support@blueravensolar.com

Homeowner Signature:  *George Strakis*          Date:  03 / 13 / 2024

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|---|---|---|
| **George Strakis** Email: strakisgeorge@me.com | | |

| | | |
|---|---|---|
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |

**Recipient Verification:**

✓ Email verified    13 Mar 2024 17:33:42 UTC

IP address: 99.149.26.146
Location: Indianapolis, United States

Document completed by all parties on:
13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 50,000+ companies worldwide.





# Homeowner Permission for Inspection Access

Homeowner Name __George Strakis_____

Property Address __1027 East Brunswick Avenue, Indianapolis, Indiana, 46227_____

Phone __3172017937_____    Email __strakisgeorge@me.com_____

With my signature below, I grant the following contractor and any municipal or utility inspecting authority having jurisdiction over my property, and each of its respective employees, agents, independent contractors, and subcontractors, the right to access and be on all of my property as necessary for permit and inspection-related activities concerning the inspection, design and engineering, construction and installation, interconnection, and energization of my photovoltaic solar system at the property address first stated above.

The contractor performing the inspection, design and engineering, construction and installation, interconnection, and energization of my photovoltaic solar system is:

Contractor Name: __BRS Field Ops, LLC_____

Address: __1403 N. Research Way_____
__Orem, UT  84097_____

FEIN: __81-4452370_____
Phone: __800-377-4480_____
Fax: __385-265-5041 (Send ATTENTION to "Support")__
Email: __support@blueravensolar.com_____

Homeowner Signature: _*George Strakis*_____    Date: __03 / 13 / 2024_____

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|--------|-----------|-----------|
| **George Strakis**<br>Email: strakisgeorge@me.com | | |
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |

**Recipient Verification:**

✔ Email verified          13 Mar 2024 17:33:42 UTC

IP address: 99.149.26.146
Location: Indianapolis, United States

Document completed by all parties on:
13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.





**BRS FIELD OPS, LLC**
1403 N. Research Way
Orem, UT 84097
800-377-4480
support@blueravensolar.com
License # <u>see local municipality</u>

# SOLAR SYSTEM HOME IMPROVEMENT CONTRACT

Customer Name   George Strakis
_____

Address   1027 East Brunswick Avenue, Indianapolis, Indiana, 46227
_____

Phone   3172017937 _____ Email   strakisgeorge@me.com
_____

      THIS SOLAR SYSTEM HOME IMPROVEMENT CONTRACT (the "Agreement") is entered into by and between **BRS FIELD OPS, LLC** ("Company"), a Utah limited liability company *doing business as* <u>Blue Raven Solar</u>, and the customer(s) identified above ("you" or the "Customer") (collectively, the "Parties") for the purchase and installation of a solar photovoltaic system together with a solar energy storage device, *if any*:

      **NOW THEREFORE**, for and in consideration of the mutual covenants and agreements contained herein and each act done pursuant hereto, the Parties, intending to be legally bound, agree as follows:

1. **Definitions**. Unless the context otherwise requires, when used herein the following terms shall have the meaning indicated:

    1.1.   <u>Agreement Documents</u> means all documents, exhibits, attachments, and addenda identified herein and those delivered as a part hereof or incident hereto, including but not limited to the Investment Tax Credit Addendum. The Agreement Documents are incorporated as part of this Agreement by reference. If and to the extent this Agreement and the Agreement Documents conflict, the Agreement Documents control.

    1.2.   <u>Battery</u> means the energy storage device and components, *if any*, [to be] installed at the Site.

    1.3.   <u>Battery Storage Capacity</u> means the total electrical storage capacity of the Battery in kilowatt-hours.

    1.4.   <u>Day</u> means, unless otherwise indicated, a calendar day.

    1.5.   <u>Effective Date</u> means the date this Agreement shall be effective; that is, when all Parties hereto have executed the same and delivered counterparts of such signatures to the other Parties.

    1.6.   <u>Final Design</u> means the proposal of the System Size, PV module layout, inverter(s), and estimated yearly production prepared following the Site Survey.

    1.7.   <u>Property</u> or <u>Site</u> means the physical location of the [to be] installed System.

    1.8.   <u>Purchase Amount</u> means the total amount payable by Customer to Company in cash, cash equivalent, or purchase money loan proceeds for Company's performance hereunder. If sales tax is charged on Systems in your area, then such sales taxes are included in the Purchase Amount.

    1.9.   <u>PV</u> means solar photovoltaic.

    1.10.   <u>Site Survey</u> means the on-site inspection of the Property for the installation of the System. The Site Survey is necessary for the preparation of the Final Design.

    1.11.   <u>Substantial Completion</u> means the state of completion of the Work in a good and workmanlike manner in accordance with this Agreement waiting only on final regulatory inspection and interconnection.

    1.12.   <u>System</u> means all PV, Battery, *if any*, and other electrical and structural devices and components [to be] installed at the Site for the generation or generation *and* storage of solar energy. References in this Agreement to *System(s)*, *PV or PV module(s)*, Batter(ies), *inverter(s)*, *device(s)*, *component(s)*, *equipment*, or other terms of similar import shall be construed to be of such number, identification, and composition as the context or the Agreement Documents require or permit.

    1.13.   <u>System Size</u> means the estimated total size of the System array in kilowatts.

    1.14.   <u>System Cost</u> means the total cost of the System, as set forth in the Agreement Documents, including labor, PV modules, Battery, *if any*, and electrical and structural devices and components.

    1.15.   <u>Work</u> means the marketing, sales, electrical and structural review; System design and engineering; procurement of equipment, materials, and authorizations; permitting and licensing; electrical service panel maintenance and upgrades; structural maintenance and upgrades; trenching; A/C relocation; installation of PV modules and inverters, Batteries, and/or other electrical devices and components; System interconnection; and together with all associated labor, equipment, and fees that are reasonable and necessary for System Completion as may be more fully set forth in the Agreement Documents. The Parties

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



agree that the Work is necessary and reasonable for the installation, production, maintenance, durability, and full use and enjoyment of the System.

2. **Scope of Work**. Company shall perform the services, advance fees, costs, and expenses, and furnish the goods to the extent necessary for the proper completion of the Work as may be more fully set forth in the Agreement Documents. Company may contract with third parties, and Customer agrees to accept the Work performed by such third parties. If Company contracts with another party for any of the Work, such contract and performance thereunder satisfy Company's obligations under this Agreement. Where indicated below, Company shall perform the Work using the following equipment or its equivalent:

| Qcells | Enphase IQ8+ Microinverters |
|---|---|

3. [Reserved]

4. **Proposal**. Customer acknowledges that any estimate or proposal provided by Company to Customer for or concerning the purchase and installation of PV or PV plus Battery, *if any*, does not represent a binding agreement, obligation, warranty, guaranty, or representation. Notwithstanding the foregoing, if Customer qualifies for, and fully participates in the Company's BLUEPOWER + FAST TRACK™ program, Company agrees to make payments to Customer in accordance with the terms and conditions set forth in the corresponding BLUEPOWER + FAST TRACK™ proposal provided that Company receives purchase money loan proceeds from the participating lender. The proposed design and installation assumptions of the System are as follows:

<table>
<tr><td colspan="2" align="center"><b>COST ASSUMPTIONS</b></td></tr>
<tr><td>System Cost: $ 36371</td><td rowspan="3"><i>IF APPLICABLE, SALES TAX IS INCLUDED IN THE COST</i></td></tr>
<tr><td>Solar Rebate: $ 0</td></tr>
<tr><td>Down Payment (if applicable): $ 0</td></tr>
<tr><td><b>PURCHASE AMOUNT: $ 36371</b></td><td></td></tr>
<tr><td>Federal Tax Credit (30%): $ 10911</td><td rowspan="4"><i>REBATES, CREDITS & INCENTIVES ASSUME SUCCESSFUL APPLICATION TO A GOVERNMENT OR UTILITY INCENTIVE PROGRAM, EXECUTION AND DELIVERY OF ALL REQUIRED INSTRUMENTS, AND SYSTEM ENERGIZATION</i></td></tr>
<tr><td>State Incentive: $ 0</td></tr>
<tr><td>Other Incentive $ .</td></tr>
<tr><td><b>NET SYSTEM COST: $ 25460</b></td></tr>
</table>

| PV ASSUMPTIONS | |
|---|---|
| Total System Size (kW): 5.6 | |
| Yearly Solar Production (kWh): 6393 | |
| Annual System Degradation: 0.5% | |

| BATTERY ASSUMPTIONS | |
|---|---|
| Number of Batteries: 0 | |
| Battery Storage Capacity (kWh): 0 | |
| Estimated Backup Duration (days): . | |

5. **Final Design**. Company will perform a Site Survey of the Property, and Customer grants Company permission to access, photograph, evaluate, and inspect the Property for various qualifying structural and electrical factors. After the Site Survey, Company design team will prepare and deliver the Final Design to Customer. The Parties understand that the Final Design may be different from the Proposal due to factors and conditions discovered or re-assessed at the Site Survey. The Final Design also sets forth the plans for location of PV modules, Batteries, and other details related to your System.



6.  **Payment**. If Customer elects to pay the Purchase Amount in cash or cash equivalent, half shall be due upon delivery of the Final Design, with the remaining balance due at Substantial Completion. If Customer will finance the Purchase Amount, Customer agrees that they will obtain financing from Company's preferred lender and make payments to lender in accordance with its terms and conditions. Notwithstanding anything to the contrary, full payment of the Purchase Amount is due at Substantial Completion.

7.  **Credit Card Charges**. Where Customer elects to pay the Purchase Amount, or any part thereof, through a credit card or other charge card, 1.25% of the transaction value will be charged to the Customer as a surcharge towards Company's credit card processing fees.

8.  **Title and Risk of Loss**. Transfer of title in the System, including all PV, Battery, *if any*, and electrical devices and components, and all risk of loss, damage, or destruction to the System shall occur upon the first instance of the PV module equipment being secured to Customer's roof, or in the case of a Battery, installed in or around the Customer's home.

9.  **Security Interest**. Customer acknowledges that the lender, if Customer finances the Purchase Amount, Company, or other tradesman or supplier may take a security interest in the System, or the real property the Work improves, as collateral for Customer's full payment (or repayment) of any amount financed or for Work performed as provided under applicable mechanic's lien statute or in accordance with that separate agreement between Customer and lender or Customer and Company.

10. **Termination**. The following terms and conditions govern any termination of the Agreement or cancellation of the underlying transaction(s):

    10.1.  <u>0–3 Days After Signing</u>: Customer may cancel this Agreement, pursuant to the Notice of Cancellation attached herewith, within three days of signing this Agreement with no penalty or obligation.
    10.2.  <u>0–10 Days After Delivery of the Final Design</u>: Customer has ten days after delivery of the initial Final Design following the Site Survey to cancel this Agreement without any penalty or obligation. Customer may cancel under this scenario by mail or electronic delivering (e-mail) of written notice of cancellation to Company.
    10.3.  <u>After 10 Days of Delivery of the Final Design but Before Installation</u>: Customer recognizes that by signing this Agreement, Company begins expending efforts and resources to add value to Customer by commissioning and paying for a Site Survey, creating permit-quality designs for the System, and otherwise doing the work required to obtain regulatory approval. Accordingly, if Customer cancels this Agreement without cause outside of the cancellation period allowed by law and more than ten days after delivery of the initial Final Design following the Site Survey but before commencement of System installation, Customer shall pay Company a reimbursement fee equal to one thousand two hundred fifteen dollars ($1,215) as compensation for the work, value, and efforts provided by Company to Customer ("Reimbursement Fee"). Notwithstanding the foregoing, Company reserves all available legal and equitable remedies for any breach by Customer including the termination of this Agreement on or after commencement of System installation.
    10.4.  <u>Cancellation by Company</u>: Company may terminate this Agreement, in whole or in part, for convenience, with or without cause. If Company cancels the Agreement without cause, Customer is under no further obligations under this Agreement.
    10.5.  <u>Effect of Termination</u>: In the event of any termination of this Agreement as provided in Sections 10.3 or 10.4 above or Customer breach of this Agreement, Customer shall pay Company for all costs, time, materials, and fees reasonably incurred by Company in the performance of the Work that improves or adds value to the Property, which shall be in addition to the Reimbursement Fee and any other amounts due under the Agreement.

11. **Change Request**. Customer shall pay Company one hundred thirty-seven dollars ($137) for each change to the System that is requested more than ten days after delivery of the initial Final Design following the Site Survey. The requested change (the "Change Order"), *if any*, constitutes an amendment to this Agreement and performance thereunder is subject to mutual acceptance by the Parties. Customer shall make no changes to the Work required to be performed under this Agreement, nor shall Company be under obligation to perform any extra or modified work without a Change

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



Order signed by the Parties describing the changes, the additional compensation, and the extended time, *if any*. Customer acknowledges that additional features, non-standard work, extra work, more PV modules, greater PV production, etc. may result in a higher contract price.

12. **Provision of Goods**. Company may offer to provide certain goods and hardware (collectively, the "Goods") in advance of the final installation of the System. In the event Customer accepts and receives the Goods and later cancels the Agreement, Customer agrees to the following in addition to the terms and conditions stated in the Termination Section above:

   12.1.  In accordance with this Agreement, if cancellation is within the statutory cancellation period or within ten days after delivery of the initial Final Design following the Site Survey, Customer agrees to return the Goods to Company in substantially the same condition in which they were received by Customer. Customer shall pay three hundred fifty dollars ($350) to Company if Customer elects to retain the Goods after previously mentioned cancellation period. All Goods returned or payment for retained Goods shall be made within seven (7) business days of cancellation. If the Goods are not returned and the payment not made, then Company reserves all rights to seek full performance of the Agreement.

13. **Work Schedule**. Company will attempt to keep Customer apprised of estimated timelines associated with installing the System. Customer acknowledges that due to required waiting periods associated with some localities, Customer may not hear from Company for an extended amount of time as there will be no updates to report, and inspectors from the governing jurisdiction may show up without advance warning to Customer, even with Company's best efforts as Company cannot control how governing jurisdictions treat Customer. Company makes no representations regarding the length of time required to begin or complete the System, as regulatory entities, HOAs, and other governing bodies can cause delays in the amount of time necessary. If a sales representative discussed a timeline with Customer, Customer acknowledges such timeline and the timeline provided below is only an estimate that can vary significantly based on factors outside of Company's control, and that Customer will not rely on a timeline estimate. Customer acknowledges and agrees that Company does not control loan interest rates or loan terms and that work schedule and delays may require Customer to reapply for financing, which increase the cost to finance the System.

   1–2 weeks for initial Site Survey;
   1–2 weeks for design and approval;
   1–6 weeks (or longer) for permit submission and approval; and
   1–6 weeks for installation, final inspection, and interconnection (depending on inspection).

14. **Damages Caused by Delay**. To the extent that Customer should commit or omit an act within its control that causes delay to the Work. Customer shall pay Company for its actual costs and expenses, including but not limited to mobilization and labor expenses and loss of business or profit, incurred as a result of such delay.

15. **Previous Work and Unforeseen Conditions**. Customer hereby warrants that all previous improvements, construction, and installations conducted on the Site, including any HVAC, electrical, and structural work, were properly permitted and inspected (collectively, "Previous Work").  Customer agrees to promptly pay any charges, fines, penalties, or other fees reasonably incurred by Company under this Section or levied by a regulatory entity and make any corrections resulting from the discovery of any unpermitted improvements or alterations during the work conducted by Company or any inspections conducted by a government entity. Customer acknowledges that Company cannot reasonably identify or discover all possible inspection or code concerns, and that it is relying on Customer to have properly had all previous work and improvements performed and the Site otherwise up to applicable code. If previous work, concealed, or unknown physical conditions are encountered at the site of the performance of the Work that differ materially from those disclosed by Customer or from those conditions immediately apparent from Site Survey, Company may elect to undertake necessary corrective work and, regardless of whether Company undertakes such work, terms concerning price and schedule shall be subject to equitable adjustment, which corrective work and adjustments shall not require the consent of Customer. Customer acknowledges and agrees that under no circumstance shall Company be liable to Customer, a member of Customer's household, or an invitee of Customer for any loss, damage, injury, or death arising from any Previous Work. If at any time a home construction service requires extra costs above the cost specified or estimated in the Agreement that were reasonably unforeseen, but necessary, and the total of all extra costs to date

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



exceeds five thousand dollars over the course of the entire home construction contract, Customer has a right to an estimate of those excess costs before Company begins work related to those costs. Company will provide this estimate in written form.

16. **Community Association**. Customer agrees to notify Company if there are any CC&Rs, HOAs, or other local restrictions present on the Site. Company relies on Customer for this information and does not do a title search to determine if there are applicable restrictions. Customer accepts all responsibility for working and complying with Customer's HOA, Architectural Control Committee, or other community association body (collectively, the "HOA"), and agrees to be solely responsible for all costs associated with any of these governing bodies, including fines for non-compliance with their requirements. To the extent necessary, Customer hereby authorizes Company to represent Customer before the HOA in connection with Customer's application for System approval. Customer further authorizes and gives permission to the HOA to send, correspond, or communicate with Company concerning Customer's application for System approval. Customer specifically waives any and all claims against the HOA in association with its release of information to Company as authorized herein.

17. **Tree Shade**. Trees on the Property or adjacent property may cast shade on the System thereby lowering System production. Company will use reasonably commercial efforts to identify and take into account tree shade when designing the System. To the extent Company provides a Final Design with production estimates based on material assumptions of certain undertakings of tree relocation, removal, or trimming, Customer hereby releases Company from any claim, complaint, duty, or obligation in any way related to the loss of System production caused by shade from such trees. Further, Customer expressly acknowledges and agrees that any such tree work, whether undertaken by Customer or at Company's direction, shall not be a reason to suspend or delay the scheduling or commencement of System installation or Customer's payment obligations hereunder.

18. **Intended Use and No Obligation to Remove System**.

   18.1.   The System and the Work performed hereunder is intended for the sole use of Customer.  No other person or entity shall be entitled to rely on the services, plans, recommendations, or specifications provided as part of the Work without the written authorization of Company. The System is intended to be installed, and nothing contained in this Agreement obligates Company to remove and replace any part of the System, even to accommodate roof repair or replacement. Customer bears all responsibility, obligation, liabilities, and fair market costs associated with the removal and replacement of the System, even where it is determined that Customer's roof would need to be replaced at some point in the future prior to the installation of the System. For purposes of this Section, fair market cost means the amount charged by the contractor performing the removal or replacement.

   18.2.   In the event Company installs permanent roof anchors as part of its fall protection measures, Customer consents to such installation and acknowledges that it will (i) not be removed at the conclusion of the Work; and (ii) is intended for the sole use of Company in the performance of the Work. Customer acknowledges and agrees that no other person or entity, including Customer, may use or rely on such permanent roof anchors for fall protection or related purposes. Customer, for himself or herself, and for Customer's successors, agents, and assigns, hereby releases Company from any claim or demand relating to any prohibited use or reliance on such permanent roof anchors, *if applicable*.

19. **System Access**. Customer grants Company and their respective employees, agents, independent contractors, and contractors the right to reasonably access all of the Property as necessary performance of the Work and the operation, maintenance, removal, or repair of the System. Following the completion of the Work, Company shall provide Customer with reasonable notice of its need to access the property whenever commercially reasonable. Customer hereby agrees that Company is not responsible for any damage resulting from reasonable entry necessary for the performance of the Work, including but not limited to: sheetrock, paint, wallpaper, flooring, ceilings, walls, cabinetry, etc.

20. **Matching**. Customer acknowledges and agrees that the performance of the Work may result in mismatches between existing material and new or reconfigured material used to repair, replace, or relocate damaged or unwanted material because of (i) texture; (ii) color fading, oxidation, and weathering; (iii) wear and tear, marring, scratching, or

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



deterioration; or (iv) obsolescence or discontinuation. Company will make a good faith effort to match new or reconfigured materials with existing materials; however, under no circumstances shall Company be liable for the loss in value to any property due to mismatch between existing and new or reconfigured materials.

21. **Standard of Work**. Company shall perform its work in a manner consistent with the level of care and skill ordinarily exercised by other members of the profession currently working under similar circumstances and shall only engage others who perform work at the same level of care and skill. Except as expressly provided in Exhibit 1 to this Agreement, Company hereby disclaims, and Customer unconditionally and irrevocably waives and releases, any and all actual or potential rights Customer might have against Company regarding any form of warranty, express or implied, of any kind or type, relating to and concerning the installation, maintenance, and repair of the System or in connection with Customer's eligibility or participation in a government or utility energy credit, rebate, or incentive program. SUCH WAIVER AND RELEASE INCLUDES TO THE FULLEST EXTENT PERMITTED BY LAW, A WAIVER AND RELEASE OF EXPRESS WARRANTIES (EXCEPT THOSE REPRESENTATIONS AND WARRANTIES OTHERWISE EXPRESSLY SET FORTH IN EXHIBIT 1), IMPLIED WARRANTIES, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF MERCHANTABILITY, WARRANTIES OF HABITABILITY, STRICT LIABILITY, RIGHTS AND CLAIMS OF EVERY KIND AND TYPE. Customer acknowledges that Company does not provide a warranty as to the amount the System will offset Customer's utility usage or bill. The System will provide an amount of power that will not increase beyond its manufactured capacity; whereas Customer's usage can increase and decrease depending on factors outside of Company's control. Accordingly, the warranties and guaranties expressly stated in Exhibit 1 only relate to what the System produces and not to Customer's offset.

22. **Remedies**. If Customer does not timely pay the Purchase Amount, Reimbursement Fee, or other amounts Customer is responsible for which are necessary to complete the Work, then Company is released from any further obligations to Customer hereunder, including those warranties and guaranties expressly stated in Exhibit 1. Further, Company may take all steps necessary to collect the amount(s) owing, including, but not limited to: initiating collection attempts, hiring an attorney or collection agency, shutting off the System, reporting the amounts owing to a credit reporting agency, and pursuing all lawful remedies to obtain payment.

23. **Waiver of Subrogation**. Except where prohibited, Company and Customer agree that with respect to any injury or property loss which is covered by insurance then being carried by Company or Customer, respectively, the party carrying such insurance and suffering said loss releases the other, and against the partners, members, officers, employees, agents, and representatives of the other, of and from any and all claims with respect to such loss, and they further agree that their respective insurance companies shall have no right of subrogation against the other on account thereof.

24. **Miscellaneous**.

    24.1.  <u>Notices</u>. All notices required or permitted under this Agreement shall be in writing and shall be deemed delivered when delivered in person or on the third day after being deposited in the United States mail, postage paid addressed to Company's address or sent by electronic delivery (e-mail) to the address specified most recently by Customer.

    24.2.  <u>Further Assurances</u>. Each party agrees to execute and deliver such instruments and take such further action as the other party may, from time to time, reasonably request in order to effectuate the purposes and to carry out the terms of this Agreement.

    24.3.  <u>Waiver</u>. The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver of limitation of that party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

    24.4.  <u>Non-Reliance</u>. NO EMPLOYEE OR REPRESENTATIVE OF COMPANY IS AUTHORIZED TO MAKE ANY PROMISE TO CUSTOMER THAT IS NOT CONTAINED IN THIS AGREEMENT CONCERNING COST SAVINGS, SYSTEM PERFORMANCE, TAX BENEFITS, OR GOVERNMENT OR UTILITY INCENTIVES. CUSTOMER AGREES NOT TO RELY UPON ANY PROMISE OR ESTIMATE THAT IS NOT INCLUDED IN THIS AGREEMENT. Customer acknowledges, confirms, and agrees that in entering this Agreement he or she has not relied on any statement, representation, promise, warranty, guaranty, estimate, or proposal

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW



made by Company, or any of its respective officers, employees, sales representatives, contractors, agents, or suppliers except as set forth herein.

24.5. <u>Predominant Language</u>. The English-language version of this Agreement controls and prevails in all aspects in case of inconsistency with the translated version, *if any*. A copy of the English version of this Agreement is available upon written request.

24.6. <u>Assignment</u>. Company may sell, assign, transfer, convey, or collateralize, by the operation of law or otherwise, any portion of its obligations herein. Company may delegate or subcontract to any person or entity at its sole discretion. Customer shall not assign or delegate any rights or claims under this Agreement without the prior written consent of Company, and any such assignment or delegation shall be null and void.

24.7. <u>Amendment</u>. This Agreement may only be modified or amended if amendment is made in writing and signed by both Parties.

24.8. <u>Severability</u>. If any provisions of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid or enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

24.9. <u>Applicable Law</u>. This Agreement shall be governed and construed in accordance with the laws of the State of Utah without regard to conflicts of laws.

24.10. <u>Jurisdiction</u>. BOTH PARTIES AGREE THAT ANY SUIT, ACTION, OR PROCEEDING SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY MATTER ARISING OUT OF OR IN CONNECTION WITH, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY SHALL BE BROUGHT IN THE FEDERAL OR STATE COURTS OF UTAH, SO LONG AS ONE OF SUCH COURTS SHALL HAVE SUBJECT MATTER JURISDICTION OVER SUCH SUIT, ACTION, OR PROCEEDING, AND THAT ANY CAUSE OF ACTION ARISING OUT OF THIS AGREEMENT SHALL BE DEEMED TO HAVE ARISEN FROM A TRANSACTION OF BUSINESS IN THE STATE OF UTAH, AND EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS AND SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS IN ANY SUCH SUIT, ACTION, OR PROCEEDINGS.

24.11. <u>Waiver of Class Action Lawsuits</u>. YOU AND COMPANY AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE ACTION. UNLESS YOU BOTH AGREE OTHERWISE, NEITHER PARTY MAY CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS AGAINST THE OTHER.

24.12. <u>Entire Agreement</u>. This Agreement and all Agreement Documents contain the entire agreement of the Parties and there are no other promises or conditions in any other agreement whether oral or written. This Agreement and each and every term and condition hereof, shall inure to the benefit of, and shall be binding upon, the Parties hereto and their respective permitted successors and assigns.

24.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be deemed to be an original, and all of which when taken together constitute one and the same Agreement.

25. **Licenses**. BRS Field Ops, LLC and its subcontractors, suppliers, and independent contractors may be licensed and regulated by the authority in which your System is located.

26. **Signatures**. Execution of this Agreement may be in the form of an electronic or similar signature, and such signature shall be treated as an original signature for all purposes.

27. **Assignment of Renewable Energy Credits**. If applicable, Customer hereby absolutely assigns, transfers, and conveys to Company (or its designee), without recourse to Customer, all Customer's rights, title, interest, and duties in and to all proceeds generated by the sale of solar renewable energy credits and certificates generated by the System ("Solar Proceeds"), including all general environmental benefits and attributes of the System, whether currently existing or existing in the future, and regardless of how the Solar Proceeds is registered, on what registry it is listed, or to whom the Solar Proceeds is sold. Where Solar Proceeds are sold or traded separately from the electricity generated by the System for household consumption or exported back to the utility in a process ordinarily referred to as "net metering,"



the assignment of Solar Proceeds under this Section does not assign net metering credits. Customer hereby covenants that it will transfer any and all proceeds generated by the sale of the Solar Proceeds to Company. Consideration for the Assignment of the Solar Proceeds may be used to offset the purchase price or financing cost of the System. Company hereby accepts and assumes the Assignment and the transfer of proceeds as previously described. Except as expressly provided above, the rights, titles, interests, or duties of Customer in and to Solar Proceeds or any proceeds thereof, shall not be assigned, registered, or otherwise transferred by Customer without the prior written consent of Company.

28. **Limitation of Liability**. Except as expressly stated in Exhibit 1, Customer hereby agrees that Company's total liability for any and all injuries, claims, liabilities, losses, costs, expenses, or damages whatsoever, including without limitation, attorneys' fees and costs to Customer and any third party arising out of or in any way related to Company's Work, System installation, or this Agreement, from any cause or causes, including but not limited to, Company's negligence, errors, omissions, breach of contract or any duty, is limited to the lowest amount required by applicable law. Customer agrees that Company and any contracted parties are not liable to Customer for consequential, incidental, punitive, nominal, exemplary, or special damages. In no event shall Company be liable for any difference between estimated savings or payments and actual savings or payments received, or for Customer's failure to achieve a specified amount of savings or payments, in connection with Customer's eligibility or participation in any government or utility energy credit, rebate, or incentive program.

COMPANY PROVIDES NO GUARANTY OR WARRANTY THAT ANY BATTERY INSTALLED PURSUANT TO THIS AGREEMENT WILL BE ABLE TO PROVIDE BACKUP POWER IN WHOLE OR IN PART DURING ANY POWER OUTAGES.  BACKUP AVAILABILITY IS SUBJECT TO NUMEROUS FACTORS BEYOND COMPANY'S CONTROL, SUCH AS BATTERY CHARGE CAPACITY OR LOAD DEMAND.  AS SUCH, COMPANY DISCLAIMS LIABILITY FOR ANY DAMAGES RESULTING FROM THE UNAVAILABILITY OF BATTERY POWER DURING A POWER OUTAGE, INCLUDING BUT NOT LIMITED TO DAMAGES RELATED TO THE FAILURE OF THE BATTERY TO POWER LIFE SUPPORT OR OTHER MEDICAL DEVICES DURING A POWER OUTAGE. COMPANY PROVIDES NO GUARANTEE THAT THE SYSTEM INSTALLED PURSUANT TO THIS AGREEMENT CAN BE UPGRADED IN THE FUTURE.

29. **Customer Acknowledgement**. Customer hereby acknowledges and agrees that:

29.1. Actual utility rates may go up or down and actual savings, *if any*, may vary. Historical data are not necessarily representative of future results. For further information regarding rates, contact your local utility or the State Commerce Commission or Public Utilities Commission.

29.2. The offset amount is <u>not</u> guaranteed; only the estimated System production used for administering the production guaranties expressly stated in Exhibit 1 is guaranteed.

29.3. Battery backup of electric appliances and length of backup duration is <u>not</u> guaranteed. Where applicable, Customer's own Battery backup and length duration is subject to numerous factors beyond Company's control, such as Battery charge capacity, previous work and unforeseen conditions, Site and Battery location, ambient temperature, household energy consumption, and System production. Some electric appliances may not be compatible with Battery backup.

29.4. Actual savings or payments under government or utility incentive programs are based on estimated and/or actual System size and/or production as calculated by the program administrator in its sole and absolute discretion.

29.5. The System production and size estimates used in this Agreement and the Agreement Documents to anticipate your estimated incentive program savings or payments are <u>not</u> guaranteed. Actual System production may go up and down, those administering the program may calculate System size and/or production differently from Company, and actual savings or payments under the program, *if any*, may vary.

29.6. Except as may be required, savings or payments under government or utility incentive programs are issued directly to Customer. Company will <u>never</u> issue you any such program savings or payments and will <u>never</u> compensate you for any difference between estimated program savings or payments and actual savings or payments received.

29.7. Except as may be required, Customer is solely responsible for ensuring that all required information, documentation, and paperwork for tax and other government or utility energy credits, rebates, or incentives, is obtained and submitted correctly and on-time.



29.8.    [Reserved]

29.9.    If you are in a state that allows you to select an electrical supplier, switching suppliers will cancel your net metering and require you to set up new net metering. Depending on the supplier, this can be a lengthy process, and Company is not obligated to assist during such transition. Further, any production guaranties offered in Exhibit 1 are suspended during the time your System is not approved for net metering.

29.10.   Tax and other government or utility incentives vary as to eligibility, participation, and refundability and are subject to change or termination by executive, legislative, or regulatory action, which may impact savings and payments estimates.

29.11.   Approval of your application to any government or utility incentive programs is not guaranteed.

29.12.   You agree to review all tax credits with a tax professional to determine what is actually available to you, and you will not rely on any information from sources other than a tax professional.

29.13.   You will still receive a monthly utility bill.

30.   **Customer Data**. Your privacy is important to BRS Field Ops, LLC. For a copy of our Privacy Policy, which covers how we collect, use, disclose, transfer, and store your information, please visit our website at //blueravensolar.com/privacy-policy/ or call 800-377-4480. By initialing below, you acknowledge your receipt of and opportunity to review such Privacy Policy:

Customer Initials:   _____*G.S.*_____

**YOU, THE BUYER, MAY CANCEL THIS PURCHASE AT ANY TIME PRIOR TO MIDNIGHT OF *A DATE NOT EARLIER THAN* THE THIRD BUSINESS DAY AFTER THE DATE OF THIS TRANSACTION. SEE THE ATTACHED NOTICE OF CANCELLATION FORM FOR AN EXPLANATION OF THIS RIGHT.**

**IN ADDITION TO THE STATUTORY RIGHT TO CANCEL PROVIDED ABOVE, CUSTOMER HAS TEN (10) DAYS AFTER DELIVERY OF THE INITIAL FINAL DESIGN FOLLOWING THE SITE SURVEY TO CANCEL THIS AGREEMENT WITHOUT ANY PENALTY OR OBLIGATION.**

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the Effective Date.

| **BRS FIELD OPS, LLC** | **CUSTOMER** |
|---|---|
| _/Signature_ | _Signature_ |
| Name: Reed Farnsworth | Name: George Strakis |
| Title: President | Date: 03 / 13 / 2024 |
| Date: 03 / 13 / 2024 | |

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW

## NOTICE OF CANCELLATION

**Transaction Date:** _03 / 13 / 2024_

       YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN 3 BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN 10 BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

       IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT REASONABLE TIMES AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MUST IN THE ALTERNATIVE COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

       IF THE SELLER DOES NOT EITHER PROVIDE INSTRUCTIONS FOR THE RETURN OF THE GOOD TO THE SELLER OR PICK THEM UP WITHIN 10 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION.

       TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO:

       **BRS FIELD OPS, LLC**
       **1403 N. Research Way**
       **Orem, UT  84097**

       **NOT LATER THAN MIDNIGHT OF** _03 / 23 / 2024_ **[***provided this date is not earlier than the Transaction Date plus three business days***].**

I, _____ (print name), HEREBY CANCEL THIS TRANSACTION.

                        _____
                        **Customer Signature**

                        **Date: _____**

**IN ADDITION TO THE STATUTORY RIGHT TO CANCEL PROVIDED ABOVE, CUSTOMER HAS TEN (10) DAYS AFTER DELIVERY OF THE INITIAL FINAL DESIGN FOLLOWING THE SITE SURVEY TO CANCEL THIS AGREEMENT WITHOUT ANY PENALTY OR OBLIGATION.**

## NOTICE OF CANCELLATION

**Transaction Date:** _03 / 13 / 2024_

YOU MAY CANCEL THIS TRANSACTION, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN 3 BUSINESS DAYS FROM THE ABOVE DATE. IF YOU CANCEL, ANY PROPERTY TRADED IN, ANY PAYMENTS MADE BY YOU UNDER THE CONTRACT OR SALE, AND ANY NEGOTIABLE INSTRUMENT EXECUTED BY YOU WILL BE RETURNED WITHIN 10 BUSINESS DAYS FOLLOWING RECEIPT BY THE SELLER OF YOUR CANCELLATION NOTICE, AND ANY SECURITY INTEREST ARISING OUT OF THE TRANSACTION WILL BE CANCELLED.

IF YOU CANCEL, YOU MUST MAKE AVAILABLE TO THE SELLER AT REASONABLE TIMES AT YOUR RESIDENCE, IN SUBSTANTIALLY AS GOOD CONDITION AS WHEN RECEIVED, ANY GOODS DELIVERED TO YOU UNDER THIS CONTRACT OR SALE; OR YOU MUST IN THE ALTERNATIVE COMPLY WITH THE INSTRUCTIONS OF THE SELLER REGARDING THE RETURN SHIPMENT OF THE GOODS AT THE SELLER'S EXPENSE AND RISK.

IF THE SELLER DOES NOT EITHER PROVIDE INSTRUCTIONS FOR THE RETURN OF THE GOOD TO THE SELLER OR PICK THEM UP WITHIN 10 DAYS OF THE DATE OF YOUR NOTICE OF CANCELLATION, YOU MAY RETAIN OR DISPOSE OF THE GOODS WITHOUT ANY FURTHER OBLIGATION.

TO CANCEL THIS TRANSACTION, MAIL OR DELIVER A SIGNED AND DATED COPY OF THIS CANCELLATION NOTICE OR ANY OTHER WRITTEN NOTICE, OR SEND A TELEGRAM, TO:

**BRS FIELD OPS, LLC**
**1403 N. Research Way**
**Orem, UT  84097**

**NOT LATER THAN MIDNIGHT OF** _03 / 23 / 2024_ [*provided this date is not earlier than the Transaction Date plus three business days*].

I, _____ (print name), HEREBY CANCEL THIS TRANSACTION.

_____
**Customer Signature**

**Date:** _____

IN ADDITION TO THE STATUTORY RIGHT TO CANCEL PROVIDED ABOVE, CUSTOMER HAS TEN (10) DAYS AFTER DELIVERY OF THE INITIAL FINAL DESIGN FOLLOWING THE SITE SURVEY TO CANCEL THIS AGREEMENT WITHOUT ANY PENALTY OR OBLIGATION.

# Exhibit 1: Limited Warranty and Guaranty

BRS FIELD OPS, LLC is the solar company installing the System and the company responsible for administering the warranties and guaranties under this Limited Warranty and Guaranty.

BRS FIELD OPS, LLC
1403 N. Research Way
Orem, UT  84097
800-377-4480
support@blueravensolar.com
License # __see local municipality__

| COST ASSUMPTIONS | |
|---|---|
| System Cost: $ 36371 | *IF APPLICABLE, SALES TAX IS INCLUDED IN THE COST* |
| Solar Rebate: $ 0 | |
| Down Payment (if applicable): $ 0 | |
| **PURCHASE AMOUNT: $ 36371** | |
| Federal Tax Credit (30%): $ 10911 | *REBATES, CREDITS & INCENTIVES ASSUME SUCCESSFUL APPLICATION TO A GOVERNMENT OR UTILITY INCENTIVE PROGRAM, EXECUTION AND DELIVERY OF ALL REQUIRED INSTRUMENTS, AND SYSTEM ENERGIZATION* |
| State Incentive: $ 0 | |
| Other Incentive: $ · | |
| **NET SYSTEM COST: $ 25460** | |

| PV ASSUMPTIONS | BATTERY ASSUMPTIONS |
|---|---|
| Total System Size (kW): 5.6 | Number of Batteries: 0 |
| Yearly Solar Production (kWh): 6393 | Battery Storage Capacity (kWh): 0 |
| Annual System Degradation: 0.5% | Estimated Backup Duration (days): · |

**ADDITIONAL DISCLOSURES:**

[X]   If this box is selected, Customer agrees to the assignment of renewable energy credits according to the terms and conditions of the Agreement.

[X]   If this box is selected, the pricing terms above will not change if the System is not selected for a government or utility incentive program.

   Company will not perform regular maintenance and repairs on the System.

**COMPANY WARRANTS AS FOLLOWS:**

1.   **Limited Warranty**.

   (a)   Workmanship. Company, for a period of ten (10) years from installation, warrants that the System will be designed, engineered, and constructed to meet the requirements of this Agreement and is capable of operating free of major defects and in accordance with all System manufacturer specifications. Company further warrants that the System, and each device and component of the System incorporated therein, will be new or equivalent to new, will be of suitable grade of their respective kinds for their intended use as specified herein, and shall conform in all respects to all applicable requirements of applicable laws, all governmental approvals, the plans and specifications prepared in accordance with this Agreement and all descriptions set forth herein, applicable engineering and construction codes and standards, and all other requirements of this Agreement.

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW

(b)     Roof. Company, for a period of ten (10) years from installation, warrants that, with respect to all roof penetrations made by Company, such roof penetrations, limited to three (3) inch radius of the roof penetration, shall be free from material defects in workmanship and shall be sealed or flashed to eliminate any liquid or vapor penetration, and that such roof penetrations shall not affect or otherwise diminish the strength, integrity, water-proofing, or balance of any underlying roof structure.

(c)     Equipment. Company warrants that the PV and Battery, *if any*, devices and components (the "Equipment") installed under this Agreement will be made from new or equivalent to new parts with industry standard warranties. The Equipment will carry the manufacturer's warranty as specified by the manufacturer on their website. Company shall assign all Equipment warranties to Customer. Subject to and on condition that notice of defect was given to Company within two (2) years from installation and manufacturer actually repairs and/or replaces the Equipment, Company shall furnish all reasonable labor and materials necessary to accomplish the required repair and/or replacement of the defective item. To the extent that manufacturer repairs and/or replaces the Equipment after two (2) years from installation, Customer acknowledges and agrees to furnish and bear the cost of all labor and materials necessary to accomplish the required repair and/or replacement of the defective item, unless otherwise provided by manufacturer warranty. Company makes no warranty, express or implied, concerning the Equipment except as provided herein.

2.  **PV Guaranty**.

(a)     For purposes hereof, the term "Guaranty Period" shall mean a period of two (2) years from the final completion of Customer's System.

(b)     If, for any consecutive three (3) month period during the Guaranty Period, the actual System output, as measured in kWh by the System's monitoring system ("Actual System Output"), is more than fifty percent (50%) below the projected total in kWh of the "Estimated System Output" for the same three (3) month period, as set forth in the Final Design related to the System, Company shall be obligated to cure any shortfall such that Actual System Output is within ten percent (10%) of Estimated System Output going forward. If your residence is not able to support additional panels for any reason, Company shall pay you the present value of the difference in what the utility cost should have been to you versus what it was to you due to the shortfall less ten percent as projected over a two (2) year period. Company is not obligated to compensate for any additional usage beyond the amounts set forth in the Final Design.

(c)     If, for any continuous eighteen (18) month period during the Guaranty Period, the Actual System Output is more than fifteen percent (15%) below the projected total in kWh of the Estimated System Output for the same eighteen (18) month period, as set forth in the Final Design, Company shall be obligated to cure any shortfall such that Actual System Output is within ten percent (10%) of Estimated System Output going forward. If your residence is not able to support additional panels for any reason, Company shall pay you the difference in what the utility cost should have been versus what it was to you due to the shortfall, less ten percent, over the Guaranty Period. Company is not obligated to compensate for any additional usage beyond the amounts set forth in the Final Design.

(d)     *Notwithstanding the foregoing*, Company shall have no obligation with respect to the Guaranty provided herein to the extent Customer does not have adequate cellular or internet coverage as required by the approved monitoring platform or Company is otherwise unable to monitor Actual System Output. Further, Company shall have no obligation with respect to the foregoing Guaranty for any loss of System production relating to tree shade where the relocation, removal, or trimming of such trees was a material assumption of the Estimated System Output. **For the avoidance of doubt, Company is not responsible for keeping the System free of dirt, snow, debris, and/or critter infestation**.

3.  **Warranty and Guaranty Administration**.

(a)     Unless otherwise provided, Company's warranty and guaranty obligation stated herein are limited to those defects or deficiencies which become apparent within the applicable warranty or Guaranty Period set forth above.

(b)     If Company's warranty or guaranty obligations stated herein are breached, or a defect or deficiency covered by Company is discovered during the applicable warranty or Guaranty Period set forth above, upon notice to Company, Company shall promptly repair, replace, correct the deficiency, and/or agree to an equitable price adjustment.

(c)     All reasonable labor and material costs necessary to Company's performance of its warranty and guaranty obligations shall be borne by Company.

4.  **Warranty and Guaranty Exclusions**. The warranty and guaranty obligations stated herein do not extend to:

(a)     Eligibility or participation in a government or utility energy credit, rebate, or incentive program.

(b)     Damage, malfunction, or degradation of electrical output or System performance caused by or resulting from:

i.      Customer's failure to properly operate or maintain the System, and system components, in accordance with manufacturer's published instructions available online;

ii.     Any repair, replacement, modification, enhancement, or reinstallation of the System or any part thereof using a part or service not provided or authorized;

iii.    An accident, alteration, negligence, vandalism, or other misconduct by Customer, subsequent owner or any third party, including, but not limited to, damage from golf balls, objects from others, or other impacts caused by persons; earthquake, fire, flood, or other acts of God; excessive heat or excessive cold where Battery is located; or snow covering or a snow load damaging the System; and

iv.     A power or voltage surge caused by someone other than Company including, without limitation a grid supply voltage outside of standard rage specified by your local utility or the System specifications or as a result of a local power outage or curtailment.

(c)     Except when installed by Company under agreement, electricity storage equipment such as batteries, battery cables, charge controllers, and battery management electronics, and any damage, malfunction, or reduced production in any way caused by or associated with the failure or non-performance, for any reason, of such electricity storage equipment.

(d)     Any roof performance issues:

i.      not related to roof penetration made as part of the installation of the System; or

ii.     otherwise covered by Customer's homeowner's insurance.

(e)     Loss of System production from tree shade where the relocation, removal, or trimming of such trees was a material assumption of the Estimated System Output.

(f)     Use of a Battery installed pursuant to this Agreement as the primary or backup source for medical equipment.

(g)     Any pre-existing conditions existing any time prior to installation. Company is not obligated to warranty or guaranty any pre-existing conditions of Customer and is fully released from all liability associated with such pre-existing conditions, including, but not limited to, poor roof conditions.

(h)     Company's warranty and guaranty obligations cease if the System is removed and replaced for roof work or other purposes, or if the System is serviced by unauthorized service providers. The warranty and guaranty obligations also do not transfer to new properties purchased by Customer, even if Customer takes the System to the new property.

(i)     Any Company and/or manufacturer warranty and guaranty obligations concerning Batteries installed pursuant to this Agreement shall cease if such Battery is charged from any source other than your PV modules.

(j)     COMPANY PROVIDES NO GUARANTY OR WARRANTY THAT ANY BATTERY INSTALLED PURSUANT TO THIS AGREEMENT WILL BE ABLE TO PROVIDE BACKUP POWER IN WHOLE OR IN PART DURING ANY POWER OUTAGES.  COMPANY PROVIDES NO GUARANTEE THAT ANY BATTERY INSTALLED PURSUANT TO THIS AGREEMENT CAN BE UPGRADED IN THE FUTURE.

5.    **Transfer of Warranties/Guarantees**. Company will accept and honor any valid and properly submitted claim under this Limited Warranty and Guaranty made during the applicable warranty or guarantee period by any bona fide person to whom Customer properly transfers ownership to the System by way of conveyance of the underlying real property.

[*Remainder of Page Intentionally Left Blank*]

Document Ref: SKCFE-8OT7W-SCT3A-TBOKW

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|---|---|---|
| **George Strakis**<br>Email: strakisgeorge@me.com | | |

| | | |
|---|---|---|
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |

**Recipient Verification:**

✔ Email verified          13 Mar 2024 17:33:42 UTC

IP address: 99.149.26.146
Location: Indianapolis, United States

Document completed by all parties on:
13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 50,000+ companies worldwide.





# What is the Renewable Energy Investment Tax Credit Program?

The federal residential renewable energy tax credit (RRETC) program, authorized under 26 USC § 25D, encourages the residential use of renewable energy by providing a federal tax credit to owners of solar energy generators that meet certain performance and quality standards.

The RRETC tax credit is a non-refundable, dollar-for-dollar reduction in the federal income taxes you may owe. Think of it like an IRS coupon that reduces the amount you pay the federal government. For example, claiming a $1,000 RRETC federal tax credit would reduce your federal income tax liability by $1,000. This is a non-refundable tax credit, which means you will not get a tax refund for the amount of the tax credit that exceeds your tax liability. It is important to understand that you can carry over any unused portion of the RRETC tax credit to the next tax year for up to four years. You must have sufficient tax liability in order to take advantage of the full federal RRETC. The only way you would get a refund from the government is if the amount of taxes withheld from you exceeded the amount that you owed, less the RRETC credit amount. In other words, this incentive is a credit towards taxes that are paid or owed to the government. While most customers who qualify for BLUEPOWER® have a large enough tax liability to take full advantage of the RRETC tax credit, you should consult your tax advisor for advice on your specific situation.

# Tax and Legal Advice Disclaimer

**THIS MATERIAL HAS BEEN PREPARED FOR INFORMATIONAL PURPOSES ONLY. IT DOES NOT CONSTITUTE PROFESSIONAL TAX OR LEGAL ADVICE AND SHOULD NOT BE RELIED ON AS THE ONLY SOURCE OF INFORMATION WHEN MAKING PURCHASING, INVESTMENT, OR TAX DECISIONS OR WHEN EXECUTING THIS OR OTHER BINDING DOCUMENTS.**

**TAX AND OTHER FEDERAL, STATE, AND LOCAL INCENTIVES VARY AS TO REFUNDABILITY AND ARE SUBJECT TO CHANGE OR TERMINATION BY LEGISLATIVE OR REGULATORY ACTION, WHICH MAY IMPACT SSAVINGS ESTIMATES. CONSULT A TAX AND LEGAL PROFESSIONAL FOR MORE INFORMATION.**

The information contained herein is general in nature and is based on information estimates provided you, demographic, regional, and industry assumptions, and from other sources that are subject to change. The Company guarantees neither the accuracy nor completeness of any information obtained from outside sources and is not responsible for any errors or omissions or for results obtained by you or others in reliance upon such information. The Company assumes no obligation to inform you of any changes in tax laws or other factors that could affect information contained herein. This information does not, and is not intended to, provide legal, tax, or accounting advice. You should consult your tax advisor concerning the application of tax laws to your particular situation.

Customer Initials: *G.S.* _____



# M-RETS OPERATING SYSTEM
# TERMS OF USE SCHEDULE A

## LAST MODIFIED ON December 28, 2017
### Generator Owner's Designation of Responsible Party

The undersigned on behalf of the Generator Owner, _George Strakis_, represents to M-RETS, Inc. ("M-RETS") that:

1. I/we am/are the Generator Owner who holds legal title to the Generating Unit(s) designated below.

2. I/we the Generator Owner hereby designate _CSG Aggregation_ as the Responsible Party with respect to the Generating Unit(s) listed below. The designation made hereunder expires on _12/31/2048_.

3. I/we the Generator Owner further represents that I/we have not granted similar authority or permission to any other Subscriber or Account Holder for use in the M-RETS System or any similar system.

Capitalized terms not otherwise defined herein shall have the meanings assigned to them in the M-RETS Operating System Terms of Use and M-RETS Operating Procedures.

| Generating Unit Name and Address [Generating Unit Size/System Size] | ID or EIA Plant Code and Generator Identifier (as applicable) | Meter ID |
|---|---|---|
| George Strakis<br><br>1027 East Brunswick Avenue, Indianapolis, Indiana, 46227 | | |

**RESPONSIBLE PARTY**

Name: _Kelcy Kline_

Title: _SREC Aggregation Manager_

Company Name: _Carbon Solutions Group, LLC_

Address: _2045 W Grand Ave Ste B, PMB #58751_

Address 2: _Chicago, IL 60612_

Date: _03 / 13 / 2024_

Signature: _Kelcy Kline_
DocuSigned by:
88A9E1002A4A40E...

**GENERATOR OWNER[3]**

Name: _George Strakis_

Title: _Homeowner_

Company Name: _N/A_

Address: _1027 East Brunswick Avenue, Indianapolis, Indiana, 46227_

Address 2: _____

Date: _03 / 13 / 2024_

Signature _George Strakis_

# Signature Certificate

Reference number: SKCFE-8OT7W-SCT3A-TBOKW

| Signer | Timestamp | Signature |
|---|---|---|
| **George Strakis** Email: strakisgeorge@me.com | | |

| | | |
|---|---|---|
| Sent: | 13 Mar 2024 17:31:53 UTC | |
| Viewed: | 13 Mar 2024 17:33:42 UTC | |
| Signed: | 13 Mar 2024 17:35:13 UTC | |

**Recipient Verification:**

✔ Email verified        13 Mar 2024 17:33:42 UTC

IP address: 99.149.26.146
Location: Indianapolis, United States

Document completed by all parties on:
13 Mar 2024 17:35:13 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 50,000+ companies worldwide.



# SUMMONS

STATE OF INDIANA      )     IN THE MARION CIRCUIT/SUPERIOR COURT

                        ) SS:

COUNTY OF MARION      )     CAUSE NO.:

GEORGE STAKIS,                   )
                                 )
          Plaintiff,           )
                                 )
     v.                             )
                                 )
BRS FIELD OPS, LLC,          )
d/b/a BLUE RAVEN SOLAR, and     )
BLUE RAVEN SOLAR, LLC,      )
                                 )
          Defendants.       )

TO DEFENDANT:     **BLUE RAVEN SOLAR, LLC**
                        **c/o Corporation Service Company**
                        **Registered Agent**
                        **135 North Pennsylvania Street**
                        **Suite 1610**
                        **Indianapolis, IN 46204**

You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons.   It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

If you need the name of an attorney, you may contact the Indianapolis Bar Association Lawyer Referral Service (269-2222), or the Marion County Bar Association Lawyer Referral Service (634-3950).

Dated_____12/1/2025_____          *Katherine Sweeney Bell*     (Seal)
                                               Clerk, Marion Superior Court

**(The following manner of service of summons is hereby designated).**

_____         Registered or **certified mail**.
_____         Service at place of employment, to-wit:_____
_____         Service on individual - (Personal or copy) at above address.
___x_____       Service on agent (Specify):   Corporation Service Company

Grover B. Davis, #4408-49                        **McClure McClure & Davis**
**Attorney for Plaintiff**                          6602 E. 75TH Street, Suite 112
(317) 221-0800                                Indianapolis, IN 46250

MARION COUNTY COURTS
SEAL
INDIANA

### *SHERIFF'S RETURN ON SERVICE OF SUMMONS*

I hereby certify that I have served this summons on the _____ day of _____, _____:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant, _____.

(2) By leaving a copy of the Summons and a copy of the complaint at _____ which is the dwelling pace or usual place of abode of _____ and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:_____

_____

_____          _____
Sheriff's Costs                                                                         Sheriff

By:_____
Deputy

### *CLERK'S CERTIFICATE OF MAILING*

I hereby certify that on the _____ day of _____, _____, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
Clerk, Marion Circuit/Superior Court

Dated:_____          By:_____
Deputy

### *RETURN ON SERVICE OF SUMMONS BY MAIL*

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the _____ day of _____, _____.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, _____.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by _____ on behalf of said defendant on the ____ day of _____, _____.

_____
Clerk, Marion Circuit/Superior Court

Dated:_____          By:_____
Deputy

# SUMMONS

STATE OF INDIANA    )    IN THE MARION CIRCUIT/SUPERIOR COURT
    ) SS:
COUNTY OF MARION    )    CAUSE NO.:

| | |
|---|---|
| GEORGE STAKIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BRS FIELD OPS, LLC, | ) |
| d/b/a BLUE RAVEN SOLAR, and | ) |
| BLUE RAVEN SOLAR, LLC, | ) |
| | ) |
| Defendants. | ) |

TO DEFENDANT:    **BRS FIELD OPS, LLC**
                        **1403 North Research Way**
                        **Orem, UT 84097**

You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by you or your attorney within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) days if this Summons was received by mail), or a judgment by default may be rendered against you for the relief demanded by plaintiff.

If you have a claim for relief against the plaintiff arising from the same transaction or occurrence, you must assert it in your written answer.

If you need the name of an attorney, you may contact the Indianapolis Bar Association Lawyer Referral Service (269-2222), or the Marion County Bar Association Lawyer Referral Service (634-3950).

Dated_____12/1/2025_____        *Katherine E Sweeney Bell*_____(Seal)
                                                Clerk, Marion Superior Court

### (The following manner of service of summons is hereby designated).

| | |
|---|---|
|   x   | Registered or **certified mail**. |
| _____ | Service at place of employment, to-wit:_____ |
| _____ | Service on individual - (Personal or copy) at above address. |
| _____ | Service on agent (Specify):_____ |

Grover B. Davis, #4408-49                  **McClure McClure & Davis**
**Attorney for Plaintiff**                       6602 E. 75TH Street, Suite 112
(317) 221-0800                             Indianapolis, IN 46250

### *SHERIFF'S RETURN ON SERVICE OF SUMMONS*

I hereby certify that I have served this summons on the _____ day of _____, _____:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant, _____.

(2) By leaving a copy of the Summons and a copy of the complaint at _____ which is the dwelling pace or usual place of abode of _____ and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:_____
_____

_____          _____
Sheriff's Costs                                                                            Sheriff

                                                                                   By:_____
                                                                                          Deputy

### *CLERK'S CERTIFICATE OF MAILING*

I hereby certify that on the _____ day of _____, _____, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

                                                                                   _____
                                                                                   Clerk, Marion Circuit/Superior Court

Dated:_____          By:_____
                                                                                          Deputy

### *RETURN ON SERVICE OF SUMMONS BY MAIL*

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the _____ day of _____, _____.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, _____.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by _____ on behalf of said defendant on the _____ day of _____, _____.

                                                                                   _____
                                                                                   Clerk, Marion Circuit/Superior Court

Dated:_____          By:_____
                                                                                          Deputy

STATE OF INDIANA    )     MARION CIRCUIT/SUPERIOR COURT
                     ) SS:
COUNTY OF MARION   )     CAUSE NO.:

George Strakis,                  )
                               )
             Plaintiff,        )
                               )
      v.                      )
                               )
BRS Field Ops LLC         )
d/b/a Blue Raven Solar, and  )
Blue Raven Solar LLC,     )
                               )
             Defendants.   )

## E FILING APPEARANCE BY ATTORNEY IN CIVIL CASE

**Party Classifications:**    Initiating _x_  Responding ____    Intervening ___

The undersigned attorney and all attorneys listed on this form now appear in this case for the following party member(s):

## PLAINTIFF GEORGE STRAKIS

Applicable attorney information for service as required by Trial Rule 5(B)(2) and for case
information as required by Trial Rule 5(B)(2) is as follows:

Name:        Grover B. Davis                 Attorney No.:  4408-49
              McClure McClure & Davis       Phone:     (317) 221-0800
Address:  6602 East 75th Street, Suite 112   Email:     gbdavis@gbd.law
              Indianapolis, IN 46250

Name: ☐    Scott S. Mandarich             Attorney No.: 34444-49
              McClure McClure & Davis       Phone:     (317) 221-0800
Address: ☐  6602 East 75th Street, Suite 112   Email:   smandarich@gbd.law
              Indianapolis, IN 46250

There are other party members: No.

*If first initiating party filing this case,* the Clerk is requested to assign this case the following Case Type under Administrative Rule 8(b)(3):   PL

I will accept service by FAX at the above noted number: No.

I will accept service by E-MAIL at the above noted address: Yes.

This case involves support issues. (*If yes, supply social security number for all family*

*members on continuation page).*   No.

There are related cases?   No.

This form has been served on all other parties.   No.

Additional information required by local rule:

<div style="margin-left: 50%;">

Respectfully submitted,

McCLURE McCLURE & DAVIS

/s/ Grover B. Davis_____
Grover B. Davis
Attorney at Law

</div>

Grover B. Davis, #4408-49
Scott S. Mandarich, #34444-49
MCCLURE MCCLURE & DAVIS
6602 E. 75th East Street, Suite 112
Indianapolis, Indiana 46250
Tel:   (317) 221-0800
gbdavis@gbd.law
smandarich@gbd.law

**49D05-2512-PL-056607**

Marion Superior Court 5

Filed: 12/1/2025 1:16 PM
Clerk
Marion County, Indiana

# SUMMONS

| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE MARION CIRCUIT/SUPERIOR COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO.: |

GEORGE STAKIS,                    )
                                  )
        Plaintiff,                )
                                  )
    v.                            )
                                  )
BRS FIELD OPS, LLC,               )
d/b/a BLUE RAVEN SOLAR, and       )
BLUE RAVEN SOLAR, LLC,            )
                                  )
        Defendants.               )

**TO DEFENDANT:**     **BLUE RAVEN SOLAR, LLC**
                  **c/o Corporation Service Company**
                  **Registered Agent**
                  **135 North Pennsylvania Street**
                  **Suite 1610**
                  **Indianapolis, IN 46204**

You are hereby notified that you have been sued by the person named as plaintiff and in the Court indicated above.

The nature of the suit against you is stated in the complaint which is attached to this Summons.  It also states the relief sought or the demand made against you by the plaintiff.

An answer or other appropriate response in writing to the complaint must be filed either by ~~you or your attorney~~ within twenty (20) days, commencing the day after you receive this Summons, (or twenty-three (23) ~~days if this Summons~~ was received by mail), or a judgment by default may be rendered against you for the relief demande~~d~~

If you have a claim for relief against the plaintiff arising from the same transaction or ~~occurrence, you must assert it in your~~ written answer.

If you need the name of an attorney, you may contact the Indianapolis Bar Association Lawyer Referra~~l Service (269-2~~222), or the Marion County Bar Association Lawyer Referral Service (634-3950)

Dated_____12/1/2025_____          _____Katherine Sweeney Bell_____(Seal)

                                  Clerk, Marion Superior Court

**(The following manner of service of summons is hereby designated).**

_____   Registered or **certified mail**.
_____   Service at place of employment, to-wit:_____
_____   Service on individual - (Personal or copy) at above address.
___x___   Service on agent (Specify):  Corporation Service Company

Grover B. Davis, #4408-49                    **McClure McClure & Davis**
**Attorney for Plaintiff**                          6602 E. 75TH Street, Suite 112
(317) 221-0800                               Indianapolis, IN 46250

### *SHERIFF'S RETURN ON SERVICE OF SUMMONS*

I hereby certify that I have served this summons on the _____ day of _____, _____:

(1) By delivering a copy of the Summons and a copy of the complaint to the defendant, _____

(2) By leaving a copy of the Summons and a copy of the complaint at _____ which is the dwelling pace or usual place of abode of _____ and by mailing a copy of said summons to said defendant at the above address.

(3) Other Service or Remarks:_____

_____  |  _____
Sheriff's Costs  |  Sheriff

By:_____
Deputy

### *CLERK'S CERTIFICATE OF MAILING*

I hereby certify that on the _____ day of _____, _____, I mailed a copy of this Summons and a copy of the complaint to the defendant, _____, by _____ mail, requesting a return receipt, at the address furnished by the plaintiff.

_____
Clerk, Marion Circuit/Superior Court

Dated:_____  |  By:_____
Deputy

### *RETURN ON SERVICE OF SUMMONS BY MAIL*

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by the defendant on the _____ day of _____, _____.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint was returned not accepted on the _____ day of _____, _____.

I hereby certify that the attached return receipt was received by me showing that the Summons and a copy of the complaint mailed to defendant _____ was accepted by _____ on behalf of said defendant on the _____ day of _____, _____.

_____
Clerk, Marion Circuit/Superior Court

Dated:_____  |  By:_____
Deputy



# MARION COUNTY SHERIFF'S OFFICE
## SHERIFF KERRY J. FORESTAL

**Return of Service**

*Summons/Order Petition/Motion*

| **CORP** | SERVICE CODE |
|---|---|

I hereby certify that I have served this Summons/Order/Petition/Motion etc. on the **17** ST/TH day of **December** , 2025 at **0900** hours;

☐ By delivering a copy of the Summons/Order/Petition/Motion etc. and a copy of the complaint to the defendant.

☐ By leaving a copy of the document at: _____

☐ Which is the dwelling place or usual place of abode of: _____

☐ By leaving a copy of the Summons/Order/Petition/Motion etc. with a person 16 years of age or older, at: _____

☐ By leaving a copy of the Summons/Order/Petition/Motion etc. at the defendant's place of employment with Title: _____

☑ Served on **135 PENN** _____ Corporation.

☐ Not Found - REASON: _____

Signature of Recipient: _____   (If Corporate Service) Title: _____

**Sheriff Kerry J. Forestal, of Marion County, Indiana**

BY: **R Phillips 27425**

☐ **Copy Mailed to Address**

MCSO 082025

Filed 1/6/2026 7:29 PM
Clerk
Marion County, Indiana

IN THE SUPERIOR COURT OF INDIANA
IN AND FOR MARION COUNTY

GEORGE STRAKIS,

                            Plaintiff,

v.

BRS FIELD OPS LLC d/b/a BLUE RAVEN
SOLAR, BLUE RAVEN SOLAR LLC,

                            Defendants.

Case No. 49D05-2512-PL-056607

## NOTICE OF APPEARANCE

TO:          Clerk of the Court

AND TO:      Counsel of Record

PLEASE TAKE NOTICE of the appearance of the undersigned counsel on behalf of Defendants BRS Field Ops, LLC ("BRS Field Ops") and Blue Raven Solar, LLC ("BRS") to the extent that such appearance is necessary to assert and protect the rights acquired by SunPower Inc. ("SunPower") in certain assets of BRS Field Ops and BRS.

BRS Field Ops and BRS were both debtors in Chapter 11 Bankruptcy. *In re BRS Field Ops, LLC*, No. 24-11661-CTG (Bank. D. Del. Aug. 5, 202); *In re Blue Raven Solar, LLC*, No. 24-11659-CTG (Bankr. D. Del. Aug. 5, 2024). Both bankruptcies were jointly administered with the bankruptcies of other related debtors in *In re Sunpower Corporation et al.*, No. 24-11649-CTG (Bankr. D. Del. Aug 5, 2024) ("SunPower Bankruptcy"). On September 23, 2024, the United States Bankruptcy Court for the District of Delaware entered an order approving the sale of certain assets of the debtors, including certain assets of BRS Field Ops and BRS, to Complete Solaria,

1

Inc. ("Complete Solaria"). *See* Order, Dkt 605, SunPower Bankruptcy. Complete Solaria closed on the purchase of those assets on September 30, 2024. Complete Solaria was renamed SunPower effective October 17, 2025.

This appearance is made without waiving any defenses, crossclaims or counterclaims. Further, it is made without waiving any objections as to improper service, jurisdiction, right to removal to federal court, or any other defenses available under Indiana Rule of Trial Procedure ("T.R.") 12.

The undersigned provides the following information in accordance with T.R. 3.1:

o Applicable attorney information:

    Kimberli A. Diggs, ISBA # 32802-45
    K&L Gates LLP
    1 Park Plaza, Floor 12
    Irvine, CA 92614
    Phone: (949) 623-3541
    Email: Kimberli.Diggs@klgates.com

o The civil case type of this proceeding under Administrative Rule 8(b)(3) is "PL— Civil Plenary (Civil Plenary cases filed after 1/1/2002—All Civil cases except those otherwise specifically designated)."

o The undersigned consents to service of all future pleadings or papers, except process, via the e-mail address listed above.

o The undersigned is not aware of any related cases.

DATED this 6th day of January, 2026.

*/s/ Kimberli A. Diggs*
Kimberli A. Diggs, ISBA # 32802-45
K&L Gates LLP
1 Park Plaza, Floor 12
Irvine, CA 92614
Phone: (949) 623-3541
Email: Kimberli.Diggs@klgates.com

*Counsel for Defendants BRS Field Ops, LLC and*
*Blue Raven Solar, LLC*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2026, I arranged for electronic filing of the foregoing document with the Clerk of the Court, which will provide electronic copies of the foregoing to the following parties:

> Grover B. Davis
> Scott S. Mandarich
> McClure McClure & Davis
> 6602 East 75th Street, Suite 112
> Indianapolis, IN 46250
> Telephone: (317) 221-0800
> Email: gbdavis@gbd.law
> Email: smandarich@gbd.law
>
> *Counsel for Plaintiff George Strakis*

DATED January 6, 2026, at Irvine, California.

<div align="right">

*/s/ Kimberli A. Diggs*
Kimberli A. Diggs

</div>

IN THE SUPERIOR COURT OF INDIANA
IN AND FOR MARION COUNTY

GEORGE STRAKIS,

> Plaintiff,

v.

BRS FIELD OPS LLC d/b/a BLUE RAVEN
SOLAR, BLUE RAVEN SOLAR LLC,

> Defendants.

Case No. 49D05-2512-PL-056607

## <u>NOTICE OF ENLARGEMENT OF TIME UNDER T.R. 6(B)</u>

Pursuant to Indiana Rule of Trial Procedure ("T.R.") 6(B), BRS Field Ops LLC ("BRS Field Ops") and Blue Raven Solar LLC ("BRS") hereby provide notice of automatic enlargement of their time to respond to Plaintiff's Complaint.

A response to Plaintiff's Complaint based on the December 17, 2025 effective service date for BRS was originally due within twenty days, *i.e.*, by today, January 6, 2026. *See* Return on Service filed December 17, 2026; T.R. 6(A), (D).[1] After the automatic enlargement of time under T.R. 6(B), Defendants' response to Plaintiff's Complaint is now due February 4, 2026. Plaintiff's Counsel has no objection to this enlargement of time.

---

[1] Plaintiff's Complaint does not appear to have been effectively serviced on BRS Field Ops. According to a Return of Service filed with the Court, Plaintiff personally served his Complaint on BRS's registered agent on December 17, 2025. Plaintiff also attempted to serve his Complaint on BRS Field Ops via certified mail to one of its offices on December 5, 2025. That attempted service on BRS Field Ops was ineffective, as T.R. 4.6(A)(1) requires service of a complaint on an organization's executive officer or registered agent. Service at an organization's office under T.R. 4.6(C) is only permissible when, as shown by affidavit or return documentation, service cannot be made by other means available under 4.6(A) or (B). Plaintiff provided no such affidavit or return documentation.

1

DATED this 6th day of January, 2026.

*/s/ Kimberli A. Diggs*
Kimberli A. Diggs, ISBA # 32802-45
K&L Gates LLP
1 Park Plaza, Floor 12
Irvine, CA  92614
Phone: (949) 623-3541
Email: Kimberli.Diggs@klgates.com

*Counsel for Defendants BRS Field Ops, LLC and
Blue Raven Solar, LLC*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2026, I arranged for electronic filing of the foregoing document with the Clerk of the Court, which will provide electronic copies of the foregoing to the following parties:

> Grover B. Davis
> Scott S. Mandarich
> McClure McClure & Davis
> 6602 East 75th Street, Suite 112
> Indianapolis, IN 46250
> Telephone: (317) 221-0800
> Email: gbdavis@gbd.law
> Email: smandarich@gbd.law
>
> *Counsel for Plaintiff George Strakis*

DATED January 6, 2026, at Irvine, California.

*/s/ Kimberli A. Diggs*
Kimberli A. Diggs